UNITED STATES of America, Plaintiff–Appellee,

v.

Raul DOMINGUEZ, Defendant–Appellant.

No. 92–2363.

United States Court of Appeals, Seventh Circuit.

Argued Dec. 17, 1992.

Decided April 27, 1993.

As Amended June 15, 1993.

R. Jeffrey Wagner, Asst. U.S. Atty., Milwaukee, WI (argued), for plaintiff-appellee.

Michael J. Lonski, Milwaukee, WI (argued), for defendant-appellant.

Before POSNER, FLAUM, and ROVNER, Circuit Judges.

FLAUM, Circuit Judge.

A jury convicted Raul Dominguez of one count of conspiracy to distribute in excess of five kilograms of cocaine in violation of 21 U.S.C. section 846, section 841(a)(1), and 18 U.S.C. section 2. At sentencing, the district court judge made an independent determination that Dominguez had perjured himself at trial and enhanced his base offense level two points for an obstruction of justice. U.S.S.G. § 3C1.1. On appeal, Dominguez challenges both his conviction and his sentence. We affirm.

## I.

With the help of government informant Cesar Garcia, the United States Drug Enforcement Administration ("DEA") negotiated with Jackie Dominguez, sister of Raul Dominguez, to purchase 300 kilograms of cocaine. Tr. 5. Over the course of several months and approximately ten telephone conversations, DEA agent Ray Melick arranged for the delivery of a one kilogram "sample" of cocaine as a prelude to the larger deal. Tr. 19–20. On January 11, 1991, the one kilogram sample was delivered in Guatemala City, Guatemala by co-conspirator Jose Galvan to DEA agent Janet Turnbull. Simultaneously, Agent Melick met an individual known as Raphael, allegedly Raul Dominguez, at the Milwaukee airport to transfer $12,000 as payment for the Guatemalan sample. This Milwaukee meeting was tape recorded and the recordings were admitted as evidence.

During the meeting, Agent Melick became concerned that the substance delivered was not cocaine and refused to pay until he could verify its authenticity. Tr. 31–32. The concern arose because the substance delivered to Agent Turnbull was packaged in several smaller packages as opposed to a single brick, and because a non-cocaine powder was found on the packages. Tr. 32, 35. After engaging in several phone conversations with Galvan in Guatemala City and with Jackie Dominguez in California, Melick concluded that the substance was cocaine and transferred the $12,000 payment. Tr. 34, 39. Recordings of these conversations were also entered into evidence.

After this transaction, negotiations continued. In August of 1991, government informant Garcia met with Jorge Andres, Jackie Dominguez's co-conspirator, and with Raul Dominguez in California. Tr. 8, 43–44. Garcia testified that Dominguez acknowledged meeting Agent Melick at the Milwaukee airport and stated that he did not want to do business with him again because he believed Melick was a cop. Tr. 7–8, 10. Garcia testified that the multiple kilogram deal never transpired and that aside from the one kilogram in Guatemala no cocaine was purchased or seized in connection with the charged conspiracy. Tr. 15–16. Agent Melick corroborated Garcia's testimony. Tr. 42–44, 55.

Raul Dominguez categorically denied being involved in any conspiracy or being in Milwaukee on January 11, 1991. Tr. 81. Testifying in his own defense, Dominguez claimed that he was not the man identified as Raphael, whom the jury heard on the tapes of the Milwaukee transaction. Tr. 86. However, after listening to the recordings and assessing the credibility of the witnesses, the jury rejected the misidentification defense, and found Dominguez guilty of conspiring to distribute cocaine.

## II.

On appeal, Dominguez challenges his conviction on the ground that the district court erred in admitting hearsay evidence to establish the identity of the substance delivered as cocaine. Over defense counsel's objection, the district court admitted testimony from Agent Turnbull that she had learned that "the Guatemalan police had the packages tested and they were found to contain cocaine." Tr. 62. In general, the district court is given broad discretion in determining the admissibility of evidence. Accordingly, challenges to evidentiary determinations

are reviewed for a clear abuse of this discretion. *United States v. Rodriguez*, 925 F.2d 1049, 1053 (7th Cir.1991); *United States v. L'Allier*, 838 F.2d 234, 242 (7th Cir.1988). The testimony offered by Agent Turnbull was clearly hearsay, as it was a statement, other than one made by the declarant while testifying at trial, offered to prove that the substance received was in fact cocaine. Fed. R.Evid. 801(c). There being no applicable hearsay exception, it was an abuse of discretion to admit this evidence.

■■■ The admission of the hearsay testimony does not constitute reversible error, however, "if we determine that the error had no substantial influence on the verdict." *United States v. Cherry*, 938 F.2d 748, 757 (7th Cir.1991); *United States v. Grier*, 866 F.2d 908, 920 (7th Cir.1989); FED. R.CRIM.P. 52(a) ("Any error ... which does not affect substantial rights shall be disregarded."). Only if it can be said " 'with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error,' can we conclude that the error was harmless." *United States v. Manganellis*, 864 F.2d 528, 539 (7th Cir.1988) (quoting *Kotteakos v. United States*, 328 U.S. 750, 764–65, 66 S.Ct. 1239, 1247–48, 90 L.Ed. 1557 (1946)). Thus, where other untainted incriminating evidence is overwhelming, the error is deemed harmless. *Id.*

Dominguez argues that admission of the hearsay evidence prejudiced his defense by precluding an alternative theory of defense and thus was not harmless error. Specifically, he contends that prior to the admission of Agent Turnbull's hearsay testimony there was insufficient evidence from which a rational jury could conclude beyond a reasonable doubt that the substance delivered in Guatemala was cocaine and that allowing this testimony eliminated any doubt that the conspiracy involved actual cocaine. Agent Turnbull's hearsay testimony was the only direct evidence offered to prove that the packages received in Guatemala City contained cocaine. No cocaine obtained from the conspiracy was received into evidence, nor was there any testimony regarding a chemical analysis of the substance delivered in Guatemala.

■■■ It is well established that the government need not prove the identity of a controlled substance by direct evidence, as long as the available circumstantial evidence establishes its identity beyond a reasonable doubt. *Manganellis*, 864 F.2d at 541; *see also United States v. Blanton*, 884 F.2d 973, 977 (7th Cir.1989); *United States v. Murray*, 753 F.2d 612, 615 (7th Cir.1985). Circumstantial evidence establishing identification may include a sales price consistent with that of cocaine; the covert nature of the sale; on-the-scene remarks by a conspirator identifying the substance as a drug; lay-experience based on familiarity through prior use, trading, or law enforcement; and behavior characteristic of drug sales. *Manganellis*, 864 F.2d at 541.

In the instant case, the record is unclear as to what Agent Melick considered which eventually convinced him that the delivered substance was cocaine. Review of the telephone conversations held between Melick and Jackie Dominguez or Galvan fail to reveal a factual basis to support Agent Melick's belief. Additionally, there is no evidence that Agent Turnbull, who accepted the delivery in Guatemala, was experienced in identifying cocaine. In fact Agent Melick became concerned precisely because Agent Turnbull was uncertain whether the substance she received was authentic. The other circumstantial evidence relied on by the government (an agreed upon price of $12,000, consistent with the price for one kilogram of cocaine in Guatemala and the covert manner in which the transaction was conducted, with delivery in Guatemala and payment in Milwaukee) could as easily support the existence of a sham drug sale as an authentic drug sale. More importantly, those arrangements were made by the undercover agent, and thus are not necessarily indicative of the conspirators' intent.

This evidence is distinguishable from those cases in which the identity of the substance was established by circumstantial evidence. *See Manganellis*, 864 F.2d at 541 (co-conspirator's testimony that she knew drug received from defendant was cocaine because defen-

dant told her it was and because she tried it); *Murray,* 753 F.2d at 615 (testimony by co-conspirators that they had smoked marijuana for five to ten years, and that the substance they received from the defendant to sell looked, smelled and smoked like marijuana); *United States v. Roman,* 728 F.2d 846, 859 (7th Cir.), *cert. denied,* 466 U.S. 977, 104 S.Ct. 2360, 80 L.Ed.2d 832 (1984) (same). The only substantial evidence identifying the substance was the direct evidence allowed in through improper hearsay. In the absence of the inadmissible hearsay evidence, the prosecution failed to establish the identity of the substance as cocaine.

The government's failure to prove the identity of the substance underlying a drug conviction, particularly involving an under-cover "controlled buy," creates a significant problem. It casts doubt on an essential element of the crime, the defendant's intent to sell narcotics. The risk of mistaken conclusions is much greater than in cases where there has been merely a break in the chain of custody. *See generally United States v. Lott,* 854 F.2d 244, 250 (7th Cir.1988) (discrepancies in the chain of custody go to the weight of the evidence rather than the admissibility); *L'Allier,* 838 F.2d at 242 (same). Without any objective basis to prove criminal intent, such as proof of the illegal substance, admission of the hearsay evidence might have had a substantial influence on the verdict, and thus would not be harmless error.

■ The error is not fatal to the conviction, however, if the government presented overwhelming evidence of the existence of the conspiracy and the defendant's knowing participation in its criminal objective. *See United States v. Curry,* 977 F.2d 1042, 1053 (7th Cir.1992); *United States v. Durrive,* 902 F.2d 1221, 1229 (7th Cir.1990). Proof of the identity of a controlled substance is not essential to a conspiracy conviction. *See Roman,* 728 F.2d at 859 n. 9 (nature of the substance charged in a *conspiracy* count need not be proven beyond a reasonable doubt; the substance believed to be a controlled substance need not be so in fact). As an inchoate crime, the offense of conspiracy is complete upon entering into the illegal agreement; thus, the objective of the conspiracy need not be accomplished. *United States v. Cea,* 914 F.2d 881, 886–87 (7th Cir.1990) (evidence sufficient to prove defendant conspired to possess cocaine in a reverse buy investigation where no cocaine changed hands); *cf. United States v. Haddad,* 976 F.2d 1088, 1094 (7th Cir.1992) (offense of attempt to possess cocaine is an inchoate crime which does not require completion of the underlying substantive offense); *United States v. Wesson,* 889 F.2d 134, 135 (7th Cir.1989) (offense of aiding and abetting possession of cocaine does not require proof of the substantive offense of possession). It is the intent to distribute a controlled substance that is the key element, not whether the substance actually distributed was in fact an illegal substance. *See Roman,* 728 F.2d at 859 (citation omitted).

When a defendant sells a substance which is in fact a controlled substance, it is reasonable to infer that he knew the nature of the substance and thus possessed the intent to distribute a controlled substance. Likewise, the sale of a noncontrolled substance which the defendant subjectively believes to be a controlled substance can constitute an attempt to distribute. *United States v. Everett,* 700 F.2d 900, 908 (3rd Cir.1983). In convictions of attempted possession, if an individual with the intent to obtain cocaine is duped into buying a fake substance, his intent to obtain the actual substance is established nonetheless. *United States v. Reeves,* 794 F.2d 1101, 1103 n. 2 (6th Cir.), *cert. denied,* 479 U.S. 963, 107 S.Ct. 463, 93 L.Ed.2d 408 (1986); *Everett,* 700 F.2d at 904–08. Finally, if during a "controlled buy" instigated by undercover law enforcement agents, an officer is duped into buying a fake substance substituted for the actual drug, it can be said that the officer had the intent to obtain the actual substance, but the converse does not logically follow.

The absence of identification evidence makes it more difficult for the government to prove the defendant's subjective intent to deliver a controlled substance beyond a reasonable doubt. However, it is possible if there is substantial evidence of objective acts, which taken as a whole, unequivocally establish the required subjective criminal intent to distribute a controlled substance.

*See United States v. McDowell,* 705 F.2d 426, 428 (11th Cir.1983). Accordingly, the district court's error in admitting the hearsay evidence compels reversal of Dominguez's conviction only if, after examining the record as a whole, we conclude that the error may have had a substantial influence on the outcome of the trial. *See Bank of Nova Scotia v. United States,* 487 U.S. 250, 256, 108 S.Ct. 2369, 2374, 101 L.Ed.2d 228 (1988). If the properly admitted evidence so clearly established Dominguez's knowing participation in the conspiracy that the verdict would have been the same, absent the error, then we will not overturn the conviction.

■ The existence of an agreement to distribute cocaine may be established by either direct or circumstantial evidence. *Curry,* 977 F.2d at 1053; *Durrive,* 902 F.2d at 1229. "If the prosecution presents enough circumstantial evidence to support, beyond a reasonable doubt, an inference that the defendants agreed among themselves to distribute drugs, a jury would be justified in convicting these defendants of conspiring together." *U.S. v. Townsend,* 924 F.2d 1385, 1390 (7th Cir.1991). Moreover, the prosecution is "not required to exclude every reasonable hypothesis of innocence so long as the total evidence permits a conclusion of guilt beyond a reasonable doubt." *United States v. Burrell,* 963 F.2d 976, 988 (7th Cir.1992). Ordinarily, in reviewing a challenge to the sufficiency of the evidence, we view the evidence and all reasonable inferences in the light most favorable to the government, and unless the record is devoid of evidence from which any rational jury could have found the defendant guilty beyond a reasonable doubt, we will affirm. *Curry,* 977 F.2d at 1053. Because this jury may have considered improperly admitted evidence, however, we review the record to determine whether the other evidence was overwhelming and thus the error was harmless.

To prove the existence of the conspiracy and the defendant's participation, the government presented the testimony of the undercover agents, the testimony of the informant, and several recorded conversations. Confidential informant Garcia testified that he introduced Jackie Dominguez to Agent Melick in order to set up the controlled buy. At least two of the initial conversations between Jackie Dominguez and Melick were recorded and entered into evidence. Garcia also testified about his continued contact with the conspirators during the negotiations until the multikilogram deal collapsed. He testified that, eight months after the one kilogram transaction, he spoke to Raul Dominguez in California and that Dominguez told him that he had met Melick in Milwaukee, suspected Melick was an undercover agent, and did not want to go through with the larger deal.

Agent Melick testified that he negotiated the purchase of 300 kilograms of cocaine to be delivered in Milwaukee, Wisconsin. Before the multikilogram transaction, he arranged for a one kilogram sample of cocaine to be delivered in Guatemala and for the payment to occur in Milwaukee. As is common in conducting drug negotiations, Melick gave Jackie Dominguez the number to an electronic paging device ("beeper"). He was subsequently contacted through the beeper by a man calling himself Raphael, whom Melick identified as the defendant. Melick met Raul Dominguez at the Milwaukee airport and wore a wire to record the transaction. In an attempt to verify the authenticity of the cocaine delivered to Agent Turnbull, Melick contacted both Jackie Dominguez in California and Galvan in Guatemala. These telephone conversations were recorded and admitted into evidence. Satisfied that the substance was in fact cocaine, Melick transferred the $12,000 payment to the defendant and again called Jackie Dominguez in California to have Raul Dominguez assure her that he had been paid. Nearly eight months after this transaction, Melick went to California to meet with Jackie Dominguez in order to continue negotiations for the 300 kilogram deal.[1] He testified that he saw Raul Domin-

---

1. Because negotiations for the larger deal continued, we disagree with the position that "[i]t is equally plausible that the one kilogram deal was a sham designed to 'test the waters' with Melick." Dissent, p. 686. On the contrary, it seems implausible that a drug dealer (and therefore, a government agent pretending to be one) would risk negotiating for millions of dollars of cocaine with the same suppliers who had previously stolen $12,000, substituting a fake substance for the agreed kilogram of cocaine. One obvious purpose for a sample deal is to test the ability and

guez while in California and identified him as the man he had met at the Milwaukee airport.

Raul Dominguez also took the stand at trial. Testifying in support of his misidentification defense, Dominguez stated that he had never been to Milwaukee and was not the man Melick met at the Milwaukee airport. Dominguez also testified that he did not know that his sister or Jorge Andres were involved in cocaine dealing. The jury also learned from Dominguez that his sister Jackie had been arrested at the Detroit airport for what he said he believed were immigration violations. When questioned on cross-examination, however, he expressed doubt that the arrest stemmed from immigration problems.

The untainted evidence in this case overwhelmingly supports the jury's verdict. The jury had the opportunity to judge the credibility of Agent Melick and the government informant, who both identified the defendant as a key member of the conspiracy. In addition, the jury considered the recordings of the initial conversations setting up the deal, the calls to assure the agents that the delivered substance was cocaine, and the encounter between Melick and Dominguez during the Milwaukee airport transaction. Moreover, the jury had the opportunity to judge the defendant's credibility from his testimony and his demeanor on the stand. After comparing the defendant's voice from his trial testimony with the voice on the tape recording of the Milwaukee transaction, the jury believed that Raul Dominguez was the same man identified as "Raphael" who received the money from Agent Melick. The error in admitting the hearsay testimony was harmless because the other evidence clearly established Dominguez's participation in the conspiracy. *See Cherry,* 938 F.2d at 757–58; *Grier,* 866 F.2d at 920–22.

■ Determinations as to the credibility of the witnesses are particularly within the province of the jury, and ordinarily we give them deference. *See United States v. Villasenor,* 977 F.2d 331, 335 (7th Cir.1992); *United States v. Van Wyhe,* 965 F.2d 528, 531 (7th Cir.1992). In this case, we also have the judge's credibility findings to support the weight of the evidence against Dominguez. At sentencing, the judge made specific findings, discussed below, that the defendant's testimony was inherently unreliable and perjurious. This further supports the jury's decision to discount the defendant's testimony.

■ Finally, we address Dominguez's challenge that the district court erroneously enhanced his base offense level two points for an obstruction of justice. Section 3C1.1 of the United States Sentencing Guidelines provides that:

> If the defendant wilfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the investigation, prosecution, or sentencing of the instant offense, increase the [defendant's] offense level by 2 levels.

U.S.S.G. § 3C1.1 (Nov.1991). Application note 3(b) includes "committing, suborning, or attempting to suborn perjury" as conduct which constitutes obstruction of justice. U.S.S.G. § 3C1.1, comment (n. 3(b)) (Nov. 1991).

Dominguez argues that increasing a defendant's base offense level under section 3C1.1 for perjury is unconstitutional because it chills a defendant's right to testify in his own defense. We have previously rejected this same argument. *United States v. Contreras,* 937 F.2d 1191, 1194–95 (7th Cir.1991); *see United States v. Adebayo & Davis,* 985 F.2d 1333, 1340 (7th Cir.1993); *United States v. Casanova,* 970 F.2d 371, 378 (7th Cir.1992). Recently the Supreme Court in *United States v. Dunnigan,* —— U.S. ——, ——, 113 S.Ct. 1111, 1112, 122 L.Ed.2d 445 (1993),

reliability of the supplier to "come through" with the drugs. The fact that negotiations continued after the sample delivery would appear to preclude any reasonable inference other than that the conspirators delivered real cocaine. There-fore, whether he chose the misidentification defense or the sham cocaine defense, Dominguez had to persuade the jury that the agents and the informant were incredible.

confirmed our position, holding that a sentence enhanced by application of section 3C1.1 for the commission of perjury does not undermine the right to testify or remain silent.

To guard against sentence enhancement as a matter of course for every testifying defendant who is convicted, the Court held that if a defendant objects to a sentence enhancement resulting from his trial testimony, the district court is required to "review the evidence and make independent findings necessary to establish a willful impediment to or obstruction of justice...." *Id.* Although "it is preferable for a district court to address each element of the alleged perjury in a separate and clear finding," it is sufficient if "the court makes a finding of an obstruction or impediment of justice that encompasses all of the factual predicates for a finding of perjury." *Id.* The sentencing court's determination that a defendant testified falsely at trial is a finding of fact which will be accepted unless it is clearly erroneous. *United States v. Easley,* 977 F.2d 283, 286 (7th Cir.1992); *Casanova,* 970 F.2d at 377.

At sentencing, Judge Curran made an independent determination based upon observations of the defendant's credibility while testifying and an assessment of the facts, *Casanova,* 970 F.2d at 377, that Dominguez had perjured himself at trial and enhanced his base offense level two points for willful obstruction of justice under section 3C1.1. Even though Dominguez does not challenge the sentencing judge's finding of fact, we have reviewed the sentencing transcript and find no clear error. Recognizing his duty to make an independent factual determination, Judge Curran made the following observation as to Dominguez's demeanor: "It appeared to the court after many years of observing witnesses, that this defendant was very nervous and very uncomfortable, especially during that part of his testimony where he challenged the identity and identification." Sentencing Tr. at 7. The judge concluded: "Under the circumstances the testimony of this defendant was at such odds with the other evidence in the record that I can only conclude that he gave false testimony during

his trial and therefore, the two-level enhancement is appropriate." *Id.* We find the court's determination sufficient to encompass all of the factual predicates for a finding of perjury. Given the testimony offered by the agents and by the confidential informant which contradicted Dominguez's misidentification defense, there is ample support for the district court's findings.

### III.

Dominguez was convicted only of conspiring to distribute cocaine, not the substantive offense of cocaine distribution. Identification of the transferred substance as an actual controlled substance was not required for conviction. Because the properly admitted evidence overwhelmingly established the defendant's knowing participation in a conspiracy to distribute cocaine, we AFFIRM.

ILANA DIAMOND ROVNER, Circuit Judge, dissenting.

I agree that the district court abused its discretion when it admitted hearsay evidence identifying the "one kilogram sample" as cocaine. Because I cannot conclude with fair assurance that the district court's error did not substantially influence the jury's verdict, however, I would reverse defendant's conviction and remand for a new trial.

As the majority explains, in order to find the district court's error harmless, we must be convinced " 'with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error.' " (*Ante* at 681) (quoting *United States v. Manganellis,* 864 F.2d 528, 539 (7th Cir.1988).) Our inquiry " 'cannot be merely whether there was enough to support the result, apart from the phrase affected by the error. It is rather, even so, whether the error itself had substantial influence.' " *United States v. Grier,* 866 F.2d 908, 920 (7th Cir.1989) (quoting *Kotteakos v. United States,* 328 U.S. 750, 765, 66 S.Ct. 1239, 1247–48, 90 L.Ed. 1557 (1946)). Thus, the majority properly requires that the untainted, incriminating evidence be "overwhelming" (*ante* at 681) and that it "unequivocally establish" defendant's subjective criminal intent to sell narcotics, which is "an essential element"

of the conspiracy charged here. (*Id.* at 682, 683.)[1] Unlike the majority, I do not find that the untainted evidence here unequivocally establishes Dominguez' criminal intent.

The evidence definitively shows that Dominguez was engaged in a scheme to distribute a powdery substance to the government agents. However, it does not unequivocally establish defendant's intent to distribute a *controlled* substance. The only direct evidence of defendant's criminal intent in this respect was the improper hearsay. The majority meticulously details the circumstantial evidence of Dominguez' participation in a conspiracy and finds that evidence overwhelming. (*Id.* at 683–84.) The evidence of a conspiratorial agreement is indeed overwhelming, but it is just as indicative of an agreement to conduct a sham transaction as it is of an agreement to consummate an authentic drug deal. In fact, the majority dismisses similar circumstantial evidence going to the identity of the distributed substance because it "could as easily support the existence of a sham drug sale as an authentic drug sale." (*Id.* at 681–82.) The same is true of the circumstantial evidence of defendant's intent. It could as easily suggest an intent to conduct a sham deal.

The evidence most probative of subjective criminal intent is the testimony of the confidential informant that eight months after the one kilogram deal, Dominguez stated that he did not want to go through with the larger deal because he believed that Agent Melick was an undercover agent. Although this certainly suggests that the later multikilogram deal would have involved authentic cocaine, it does not confirm that the earlier deal did. It is equally plausible that the one kilogram deal was a sham designed to "test the waters" with Melick.[2] Thus, the informant's testimony does not "unequivocally establish" the requisite criminal intent.

Moreover, the hearsay testimony was crucial here because there was evidence suggesting that Melick himself had concerns about the authenticity of the substance. (*See id.* at 680.) Agent Melick testified that he became concerned when he learned that the substance was in several smaller packages as opposed to a single brick and when initial tests disclosed a non-cocaine powder on the packages. Indeed, the jury heard tape-recorded conversations in which Melick suggested that he was afraid of being "ripped off." Melick also expressed his concern that Agent Turnbull, who received the packages in Guatemala City, was new and inexperienced with this sort of transaction. This evidence may have raised doubts in the jurors' minds about the authenticity of the distributed substance, providing defendant an opportunity to argue that he had agreed only to scam the undercover agents.[3] The

1. As the majority points out, in conducting this inquiry, we do not view the evidence in the light most favorable to the government, as we would in reviewing a challenge to the sufficiency of the evidence. (*Id.* at 683.)

2. The majority disagrees with this postulation, finding it "implausible that a drug dealer (and therefore, a government agent pretending to be one) would risk negotiating for millions of dollars of cocaine with the same suppliers who had previously stolen $12,000, substituting a fake substance for the agreed kilogram." (*Ante* at 683–84, n. 1.) The implausibility of such a scenario would indeed be apparent if this were an actual series of transactions between a supplier and a true drug dealer, for such a dealer would be unlikely to conduct a subsequent transaction with a supplier who had "scammed" him eight months earlier. But the buyers here were not your average street dealers motivated solely by their own financial self-interest. Instead, they were government agents and a government informant who were interested in negotiating a trans-

action that would land the defendant and his confederates behind bars. It is therefore not implausible to suggest that the agents and the informant, even if burned by Dominguez eight months earlier, would press forward with plans for a subsequent deal. Moreover, Dominguez' reluctance to consummate the larger deal is entirely consistent with this "scam" theory because it evidences his distrust for the buyers and their motives. Thus, in my view, Dominguez would not have been required to "persuade the jury that the agents and the informant were incredible" (*id.*), but only that they were attempting to do their jobs. Of course, I do not mean to suggest that the majority's view of the evidence is implausible, only that the evidence is susceptible to differing interpretations—*i.e.*, it is not unequivocal.

3. Admittedly, Dominguez' primary defense at trial was mistaken identity rather than sham transaction. But that does not necessitate a finding of harmless error. After the improper identification evidence was admitted in the government's

hearsay testimony effectively erased any such doubts and foreclosed such an argument.

The majority affirms defendant's conviction largely on the basis of its assumption that "[i]dentification of the transferred substance as an actual controlled substance was not required for conviction." (*Id.* at 685; *see also id.* at 682.) But this assumes that Dominguez and his confederates *intended* to distribute *cocaine*. In other words, although it is true that the offense of conspiracy is complete upon entry into an illegal agreement, the agreement does not violate the statutes at issue here unless it involves the intent to distribute *a controlled substance*. If the conspirators agree only to conduct a sham deal, there is no illegal conspiracy. This case is not necessarily like those cases discussed by the majority (*see id.* at 682–83) in which a defendant intended to distribute a controlled substance that turned out to be something else. An illegal agreement exists there even if the substance is never identified. The same cannot be said, however, if the conspiratorial agreement is one to pass off some other powdery substance as cocaine. In that situation, the conspirators lack the requisite intent.

As the majority concedes, failure to prove the identity of the controlled substance in this instance "creates a significant problem," for "[i]t casts doubt on an essential element of the crime, the defendant's intent to sell narcotics." (*Id.* at 681–82.) The majority also acknowledges that "[w]ithout any objective basis to prove criminal intent, such as proof of the illegal substance, admission of the hearsay evidence might have had a substantial influence on the verdict, and thus would not be harmless error." (*Id.* at 682.) I agree. Here, the circumstantial evidence of illegal intent might suggest a sham deal as readily as it does an authentic drug transaction, meaning that an essential element of the crime charged in the indictment has *not* been "unequivocally established." In these circumstances, it is difficult to say that the hearsay testimony did not have a substantial influence on the jury's verdict. Accordingly,

I respectfully dissent from the court's decision to affirm Dominguez' conviction.

case-in-chief, it would have been foolhardy for defendant to argue sham. Without the improper testimony, and given Melick's concern about the authenticity of the substance, that defense would have been much more plausible.