UNITED STATES of America,
Plaintiff–Appellee,

v.

Sheldon SCHOENBORN, Defendant–
Appellant.

No. 92–2680.

United States Court of Appeals,
Seventh Circuit.

Argued March 29, 1993.

Decided Sept. 21, 1993.

Rehearing and Suggestion for
Rehearing En Banc Denied Nov. 4, 1993.

Daniel Bach and Larry Wszalek (argued), Office of U.S. Atty., Madison, WI, for plaintiff-appellee.

Jill L. Kline (argued), Oshkosh, WI, for defendant-appellant.

Before FLAUM and KANNE, Circuit Judges, and REAVLEY, Senior Circuit Judge.[*]

---

[*] The Honorable Thomas M. Reavley, Senior Circuit Judge for the United States Court of Appeals for the Fifth Circuit, sitting by designation.

KANNE, Circuit Judge.

Sheldon Schoenborn, a prisoner at the Federal Correctional Institution in Oxford, Wisconsin, was convicted of one count of assault with a dangerous weapon, with intent to do bodily harm, in violation of 18 U.S.C. § 113(c). The jury found that on the night of December 16, 1991, Schoenborn entered the prison gym, approached fellow inmate Gordon Roy, and struck Roy several times on the head with a metal object.[1] The district court sentenced the defendant to five years in prison, the statutory maximum, and tacked on three years of supervised release following incarceration.

Schoenborn filed a timely appeal, raising four challenges to his conviction. The first and most substantial concerns an evidentiary ruling made by the district court. Schoenborn's second and third arguments are intertwined with the first, and challenge the sufficiency of the evidence against him. The final contention addresses the sentence he received. We consider these arguments seriatim, concluding that the conviction and sentenced should be affirmed.

## I.

Schoenborn claims the trial court erred in admitting into evidence a report by FBI Special Agent Richard Staedtler. On December 31, 1991, Staedtler interviewed Todd Coleman, an inmate at Oxford who was in the gym on the night of the alleged attack. The agent subsequently transcribed his interview notes into a report. Approximately four months later, in April 1992, Staedtler returned to Oxford and reviewed the report with Coleman. The report stated, in part:

A couple of weeks ago, in the evening, [Coleman] was in the gymnasium, sitting on the steps between the pool room and the basketball court. He saw a Native American inmate doing situps on the floor of the stage and another Native American punching the heavy bag. The inmate who had been punching the heavy bag then picked up a piece of pipe about two feet long from the weight bench and went over

to the inmate doing situps and hit him in the head with the pipe.

The government called Coleman at trial. His unease on the stand is apparent from the record. When asked if anything unusual happened at the Oxford gym on the night of December 16, 1991, Coleman responded that he thought there had been a fight. When asked if he saw the fight, he replied, "To a point." Coleman testified that he did not see Schoenborn strike Roy, only that he saw one Native American jump off the gym stage and run in one direction, and another Native American jump off the stage and head in the opposite direction. One of the men (Roy) was bleeding, and ran into the bathroom. Coleman followed him and helped him clean up. Though he acknowledged that a Native American man (presumably Schoenborn) was sitting in court, Coleman could not remember if he was one of the men who jumped from the stage.

Coleman was then questioned by the government about his interview with Agent Staedtler. Coleman testified that he could not remember if he had provided a statement to the agent. When shown Staedtler's report, Coleman said it did not refresh his memory of the interview, adding, "Some of the things that was said in [the report] I heard discussed by some other inmates that I guess alleged to seen what happened, but I don't remember. I don't remember." Coleman admitted that Staedtler had asked him some questions about the incident in the gym and that, as best he could remember, he had answered truthfully.

On cross-examination, Coleman testified that he thought he had seen Staedtler's report after it had been typed, but denied telling Staedtler that it was accurate. According to Coleman, Staedtler had asked him to sign the statement but he refused because he "wasn't sure about the things that were in there." He added that his answers to the agent's questions were based on what he had heard from others, not events he had actually witnessed in the gym. On redirect, Coleman

---

1. No special interrogatories were given to the jury to determine if the object was a thirty-two inch crossbar from a squat rack located in the gym, or a four and one-half inch metal sheath that fit around the crossbar. Schoenborn testified that he struck Roy with the sheath.

confessed that he did not want to testify, but insisted he was telling the truth.

Faced with the testimony of a witness with cold feet and a selective memory, the government sought to introduce Staedtler's report pursuant to Fed.R.Evid. 803(5), the recorded recollection exception to the hearsay rule.[2] Under Rule 803(5), a document may be read to a jury if (1) the witness once had knowledge about matters in the document; (2) the witness now has insufficient recollection to testify fully and accurately; and (3) the record was made or adopted at a time when the matter was fresh in the witness's memory and reflected his knowledge correctly. *United States v. Lewis*, 954 F.2d 1386, 1393 n. 6 (7th Cir.1992); *United States v. Porter*, 986 F.2d 1014, 1016–17 (6th Cir.1993), *petition for cert. filed*, July 7, 1993; *United States v. Sollars*, 979 F.2d 1294, 1298 (8th Cir.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 1864, 123 L.Ed.2d 484 (1993).

Staedtler took the stand and testified that he interviewed Coleman, took notes during their interview, and accurately transcribed them into a report. According to Staedtler, he subsequently reviewed the report with Coleman, who said the report was accurate in all respects. Counsel for Schoenborn interposed a hearsay objection and, at a side bar, opposed admission of the report under Rule 803(5) on the grounds the report was not based on Coleman's personal knowledge and he had neither prepared nor adopted it.

The government responded that Staedtler's report was admissible and could be read to the jury under this court's decision in *Lewis*, 954 F.2d at 1392–95. After reviewing *Lewis*, the district court allowed Staedtler to read the portion of his report set out above. On cross-examination, Staedtler admitted that Coleman refused to sign the report when the agent showed it to him. The next day, having reviewed the transcript of Coleman's testimony in conjunction with the *Lewis* decision, the district court concluded that the requirements of Rule 803(5) had been met and reaffirmed its earlier decision to admit the report.

On appeal, Schoenborn argues that this decision was error. "In general, the district court is given broad discretion in determining the admissibility of evidence. Accordingly, challenges to evidentiary determinations are reviewed for a clear abuse of this discretion." *United States v. Dominguez*, 992 F.2d 678, 680–81 (7th Cir.1993). *See also United States v. Williams*, 951 F.2d 853, 857 (7th Cir.1992). In this case, we agree with Schoenborn that the evidence should not have been admitted and that the error constituted an abuse of discretion.

The burden of proving that notes reflect a witness's own words rather than the notetaker's characterization falls on the party seeking to introduce the notes. *United States v. Almonte*, 956 F.2d 27, 29 (2d Cir.1992) (per curiam). A third party's characterization of a witness's statement "does not constitute a prior statement of that witness unless the witness has subscribed to that characterization." *Id. See also United States v. Leonardi*, 623 F.2d 746, 757 (2d Cir.), *cert. denied*, 447 U.S. 928, 100 S.Ct. 3027, 65 L.Ed.2d 1123 and 449 U.S. 884, 101 S.Ct. 236, 66 L.Ed.2d 109 (1980). Regardless of whether or not Rule 803(5)'s other requirements were met, it is clear from the testimony of both Coleman and Staedtler that Coleman did not adopt the agent's report as his own. Coleman testified that he did not tell Staedtler the report was accurate and had refused to sign it for that reason. For his part, Staedtler stated that Coleman told him the report was accurate, yet admitted that Coleman would not sign the report.

We have previously set forth the necessary *conditions for admitting a statement of past recollection recorded into evidence:*

> Where a person perceives an event and reports it to another person who records

---

**2.** Under Rule 803(5) the following is admissible as evidence:

> A memorandum or record concerning a matter about which a witness once had knowledge but now has insufficient recollection to enable the witness to testify fully and accurately, shown to have been made or adopted by the witness when the matter was fresh in the witness' memory and to reflect that knowledge correctly. If admitted, the memorandum or record may be read into evidence but may not itself be received as an exhibit unless offered by an adverse party.

the statement, both must ordinarily testify to establish that the statement is a past recollection recorded under Rule 803(5). The person who witnessed the event must testify to the accuracy of his oral report to the person who recorded the statement. The recorder must also testify to the accuracy of his transcription. *Williams,* 951 F.2d at 858.

This assumes, of course, that the witness and the individual who recorded the statement are not at odds over the accuracy of the latter's account. Where the witness differs with the recorder in regard to whether or not the recorder's transcription of the witness's statement is correct, Rule 803(5)'s requirement that the report be made or adopted by the witness has not been satisfied. *Compare United States v. Benson,* 961 F.2d 707, 709 (8th Cir.1992) ("The two interviews with [the defendant] were not reported verbatim and they were unsigned and unsworn by [him]. Thus, both reports constitute inadmissible double hearsay and should not have been admitted into evidence" under Rule 803(5)) *with Porter,* 986 F.2d at 1017 (Rule 803(5) satisfied where, among other things, the witness admitted making statement to FBI, had made the statement under penalty of perjury, had signed the statement on every page, and had changed and initialed the wording of the statement several times). What we have said about statements covered by the Jencks Act, 18 U.S.C. § 3500, applies with equal force here:

Whether a document is an original statement made by the witness, ... or a "substantially verbatim" copy ..., the emphasis clearly is on whether the statement can fairly be deemed to reflect fully and without distortion the witness's own words. A government agent's summary of a witness's oral statement that is not signed or adopted by the witness is not producible [under the Jencks Act]. Adoption or approval can be shown by demonstrating that the interviewer read back to the witness what he wrote and that the witness affirmatively stated his approval.

... A federal agent's written impression of what a witness said, his strategy, or his conclusions from what the witness said are obviously not statements of the witness—unless the government agent who is the interviewer is himself a witness and testifies about the subject matter of the report. *United States v. Allen,* 798 F.2d 985, 994 (7th Cir.1986) (citations omitted).

The government asserts that Coleman admitted that, at the time he was interviewed, he answered the agent's questions truthfully. However, it is not inconsistent for Coleman to assert that he believed he was telling the truth when he answered Staedtler's questions at their first meeting, but did not think Staedtler's report of his statement was accurate when subsequently shown to him. This is not a case in which Coleman testified merely that he could not remember what he told Staedtler but remembered that he told Staedtler the truth. *See Lewis,* 954 F.2d at 1394–95. Rather, Coleman said he told the truth, but that Staedtler's record was not an accurate representation of his statement.

Thus, our holding in *Lewis* does not govern this case. In *Lewis,* we concluded that the district court had not abused its discretion when, pursuant to Rule 803(5), it admitted a report by an FBI agent (Richard Staedtler, as it turns out) of statements made by a government witness whose memory failed on the stand. 954 F.2d at 1395. Under circumstances similar to those in the case before us, the government called a prisoner, John Jones, to testify that he had heard the defendant, Lewis, a fellow inmate, say he could have drugs and alcohol smuggled into the prison with the help of a correctional officer. *Id.* at 1392. On the stand, Jones did not remember that Lewis had said anything about secreting contraband into the prison. *Id.* Staedtler had interviewed Jones and prepared a report of the interview. After reviewing the report, Jones stated that he remembered being interviewed, and had answered the agent's questions truthfully, yet iterated that he had no recollection of telling Staedtler about the drugs or alcohol. *Id.*

Staedtler then took the stand and testified that he had interviewed Jones and taken notes, which were transcribed into a report. *Id.* at 1393. He added that the report was a fair and accurate representation of Jones's statements. Finally, Staedtler testified that,

when Jones first reviewed the report during a pre-trial meeting, he had said it was correct, but indicated that he was reluctant to testify in court for the government as to its contents. *Id.* at 1395. The report was then offered as a prior recollection recorded under Rule 803(5); the district court admitted the statement over the defendant's objection, and it was read to the jury. *Id.* at 1393.

This court affirmed the district court's ruling. Though we devoted the lion's share of our analysis to the defendant's objections based on the timeliness of Staedtler's report (specifically the delay between the defendant's statements to Jones and the interview between Jones and Staedtler, and the delay between the interview and Jones's adoption of the report at the pre-trial meeting), we determined that the court properly exercised its broad discretion in admitting Staedtler's report under Rule 803(5). *Id.* at 1395. Obviously important to our decision was the uncontroverted evidence that, on the witness stand, as at the pre-trial interview with Staedtler, Jones said the agent's statement was correct. *Id.* at 1393. Indeed, Lewis never argued that Jones did not adopt Staedtler's report, only that he did not make or adopt the statement about drugs and alcohol when the events were fresh in his memory. *Id.* We concluded that admission of the report was proper "[b]ecause there were no indications that the report was inaccurate, and because the substance [of the report] was corroborated by other evidence".

"The touchstone for admission of evidence as an exception to the hearsay rule has been the existence of circumstances which attest to its trustworthiness." *United States v. Williams,* 571 F.2d 344, 350 (6th Cir.), *cert.*

*denied,* 439 U.S. 841, 99 S.Ct. 131, 58 L.Ed.2d 139 (1978). The requisite circumstances are absent here. It is undisputed that Coleman would not put his name to Staedtler's report when it was first shown to him, and that he subsequently disavowed its accuracy on the witness stand. The district court erred in finding that Coleman had adopted Staedtler's report, and consequently abused its discretion in admitting the report as a past recollection recorded under Rule 803(5).[3]

## II.

Not all evidentiary errors warrant reversal, however. The admission of hearsay evidence does not constitute reversible error if we determine that the error had no substantial influence on the result of the trial. *United States v. Cherry,* 938 F.2d 748, 757 (7th Cir.1991). *See also United States v. Hill,* 898 F.2d 72, 75–76 (7th Cir.1990); Fed. R.Crim.P. 52(a). "A harmful error results only if the error had a 'substantial and injurious effect or influence' on the jury's verdict." *United States v. Hanson,* 994 F.2d 403, 407 (7th Cir.1993) (quoting *United States v. Peak,* 856 F.2d 825, 834 (7th Cir.), *cert. denied,* 488 U.S. 969, 109 S.Ct. 499, 102 L.Ed.2d 535 (1988)). "Only if it can be said ' " 'with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error,' can we conclude that the error was harmless." ' " *Dominguez,* 992 F.2d at 681 (quoting *United States v. Manganellis,* 864 F.2d 528, 539 (7th Cir.1988)). *See also United States v. Torres,* 977 F.2d 321, 328 (7th Cir. 1992). It follows that where the untainted incriminating evidence is overwhelming, we

---

3. At a conference during trial, the district court indicated that, had it not admitted Staedtler's report under Rule 803(5), it would have done so under Fed.R.Evid. 607, which allows a party to impeach the credibility of its own witness. Unmentioned by the district court, but necessary to its pronouncement about Rule 607, is Fed. R.Evid. 613(b), which allows for the admission of extrinsic evidence of a witness's prior inconsistent statement for purposes of impeachment if certain conditions are satisfied. Our finding that Staedtler's report did not constitute a statement made by Coleman precludes admission of the report pursuant to Rules 607 and 613(b). As the

Second Circuit observed in *Almonte,* 956 F.2d at 29:

> [I]n the absence of endorsement by the witness, a third party's notes of a witness's statement may not be admitted as a prior inconsistent statement unless they are a verbatim transcript of the witness's own words. The problem, in essence, is one of relevancy. If a third party's notes reflect only that note-taker's summary characterization of a witness's prior statement, then the notes are irrelevant as an impeaching prior inconsistent statement, and thus inadmissible.

deem the error harmless. *Dominguez*, 992 F.2d at 681.

We begin with the statute under which Schoenborn was charged. Title 18 § 113 states, in part:

> Whoever, within the special maritime and territorial jurisdiction of the United States, is guilty of an assault shall be punished as follows:
>
> . . . .
>
> (c) Assault with a dangerous weapon, with intent to do bodily harm, and without just cause or excuse, by fine of not more than $1,000 or imprisonment for not more that five years, or both.

Conviction under this provision requires proof of (1) an assault, (2) with a dangerous weapon, and (3) with specific intent to do bodily harm. *United States v. Johnson*, 967 F.2d 1431, 1433 (10th Cir.1992), *cert. denied*, — U.S. ——, 113 S.Ct. 1053, 122 L.Ed.2d 360 (1993); *United States v. Guilbert*, 692 F.2d 1340, 1343 (11th Cir.1982) (per curiam), *cert. denied*, 460 U.S. 1016, 103 S.Ct. 1260, 75 L.Ed.2d 487 (1983). *See also United States v. Washington*, 819 F.2d 221, 226 (9th Cir.1987); *United States v. Eagle*, 586 F.2d 1193, 1196 (8th Cir.1978).

In this case, the indictment charged Schoenborn with violating § 113(c) "without just cause or excuse." Ordinarily, "[t]he existence of 'just cause or excuse' for the assault is an affirmative defense, and the government does not have the burden of pleading or proving its absence." *Guilbert*, 692 F.2d at 1343. *See also United States v. Phillippi*, 655 F.2d 792, 793 (7th Cir.) (per curiam), *cert. denied*, 454 U.S. 974, 102 S.Ct. 526, 70 L.Ed.2d 394 (1981); *Hockenberry v. United States*, 422 F.2d 171, 173 (9th Cir. 1970). Because the government included this element, however, the district court required that it be proved at trial as part of the government's case. Thus, our examination of whether or not the district court's evidentiary error was harmless must take into account the government's affirmative duty to prove beyond a reasonable doubt that Schoenborn acted "without just cause of excuse."

■ In addition, our analysis necessarily requires us to address Schoenborn's challenges to the sufficiency of evidence against him. There are two. First, Schoenborn contends that the government failed to prove that he committed the assault with a dangerous weapon. Second, he argues that the government failed to prove that he acted without just cause or excuse.

We briefly summarize the evidence presented at trial. Schoenborn testified that, though he and Roy were initially friends, they had disagreements concerning a religious group to which they both belonged. On the night he went to the gym, Schoenborn thought that Roy "was shadow boxing like he was indicating something," so he approached Roy to ask "if there was a problem" and to say he did not want any trouble.

As he walked over to Roy, Schoenborn picked up "a small pipe" because he was frightened of Roy and because Roy's cousin was in the gym as well. Presumably this pipe was the four and one-half inch metal sheath that fit one of the thirty-two inch metal crossbars on the squat rack. By this time, Roy was on the floor doing situps. According to Schoenborn, Roy reached up and grabbed him by the hand, pulling him down, at which point Schoenborn reflexively struck Roy. Although he only remembered striking once, Schoenborn admitted on cross-examination that it was possible he hit Roy more than one time. The two struggled and, once when they separated and stood up, exchanged kicks and punches. According to Schoenborn, he feinted as if he was going to pick up a free weight lying on the floor, and Roy ran off. Schoenborn suffered no injuries in the altercation.

Another inmate at Oxford, Vernon McKay, testified at trial that while he was in the gym, he saw Roy doing situps on a stage. Although he did not see Roy get hit, he saw Roy and Schoenborn wrestling on the ground. Near them was a crossbar from the squat rack, as well as a small metal sheath that fit over the bar. There was blood on the sheath. McKay saw the two men stand and exchange blows; Roy was bleeding from the head. After some sparring, Roy appeared dazed. Schoenborn then picked up a free weight and walked toward Roy. At that

point, Roy jumped from the stage and ran out of the gym.

Roy testified that he was sitting on the gym stage doing situps when he was struck on the head several times. He did not see his attacker at first, but was able to reach up and pull the person down, pinning him to the floor. Roy tried to get away but the other man had grabbed his hair. When the two eventually separated and stood up, Roy recognized the other person as Schoenborn. He asked Schoenborn what he was doing when he noticed he was bleeding from the head. Roy stated that he backed up, saw Schoenborn reach for something on the ground, and turned and ran from the gym.

Jamie Penaflor, a physician assistant at Oxford, testified that Roy suffered a three centimeter cut on his forehead, a three and one-half centimeter cut on the top-back of his head, and a three centimeter cut on the back of his head. A total of fifteen stitches were required to close the wounds. The government introduced pictures of Roy's head wounds and the blood-stained gym stage, which were received as exhibits.

■ Schoenborn argues that the admission of Coleman's statement was reversible error because his "was the only testimony presented at trial which arguably established that the defendant committed the assault with a dangerous weapon...." He points out that the government, during its opening statement, told the jury McKay would testify that he saw the defendant remove the thirty-two inch crossbar from the squat rack and use it to strike Roy. The government also told the jury substantially the same thing about Coleman's testimony in its opening statement. At trial, both men testified that they did not actually see the defendant strike Roy. However, the district court admitted Staedtler's report, which mentions that Schoenborn used a "piece of pipe about two

feet long." Schoenborn contends there was insufficient evidence Roy was assaulted with a dangerous weapon because the only testimony substantiating the government's preview of the evidence during its opening statement was Staedtler's report, which was erroneously admitted.

As an initial matter, it is axiomatic that a lawyer's opening statement, unlike the testimony of witnesses, is not evidence, and the district judge so instructed the jury. *United States v. Rollins,* 862 F.2d 1282, 1290 (7th Cir.1988), *cert. denied,* 490 U.S. 1074, 109 S.Ct. 2084, 104 L.Ed.2d 648 (1989); *United States v. Fountain,* 642 F.2d 1083, 1092 n. 11 (7th Cir.), *cert. denied,* 451 U.S. 993, 101 S.Ct. 2335, 68 L.Ed.2d 854 (1981); *United States v. Harris,* 542 F.2d 1283, 1297 (7th Cir.1976), *cert. denied,* 430 U.S. 934, 97 S.Ct. 1558, 51 L.Ed.2d 779 (1977); *United States v. Trevino–Rodriguez,* 994 F.2d 533, 535 (8th Cir.1993); *United States v. Levy,* 904 F.2d 1026, 1030 (6th Cir.1990), *cert. denied,* 498 U.S. 1091, 111 S.Ct. 974, 112 L.Ed.2d 1060 (1991); *United States v. Ingraldi,* 793 F.2d 408, 414 (1st Cir.1986). Thus, in deciding whether or not the admission of Coleman's statement to Staedtler was reversible error and, in the process, whether or not the government presented sufficient evidence that Schoenborn assaulted Roy with a "dangerous weapon," we examine the sworn testimony of the witnesses and the exhibits offered by the parties, not the statements of counsel.[4] According to this evidence: the defendant admitted that he hit Roy with the sheath; McKay testified that he saw the sheath, with blood on it, lying near where Schoenborn and Roy were wrestling; Coleman testified that he saw Roy, who was bleeding, jump off the stage and run to the bathroom, where Coleman helped him clean up; Roy testified that he was struck in the head while doing situps; pictures of his head showed the extent of his

---

4. Nevertheless, we note that Schoenborn's account of the government's opening statement is incomplete. Counsel for the government did state that McKay would testify that Schoenborn struck Roy with the thirty-two inch bar. However, counsel went on to say:

> The bar also had on it a metal sheath, a four-and-a-half inch metal sheath, kind of a hollow pipe that goes onto the bar itself. After Gor-

don Roy was hit with the bar, the sheath fell off, came falling off the bar. Mr. McKay will testify that Mr. Schoenborn then, after hitting with the big bar, picked up this small sheath, hollow pipe, four-and-a-half inches, and continued to hit Mr. Roy before Mr. Roy was able to grab ahold of him and pin him down to the ground.

wounds. The evidence was more than ample to demonstrate that Schoenborn struck Roy more than once on the head with the metal sheath from the squat rack crossbar.

■ Is the sheath a "dangerous weapon" within the meaning of § 113(c)? If so, whether or not Schoenborn used the metal bar in the assault is irrelevant (though swinging the crossbar at another's head would unquestionably make *that* object a dangerous weapon).

The determination whether an object constitutes a "dangerous weapon" turns not on the object's latent capability alone, but also on the manner in which the object was used. Objects that are not dangerous weapons *per se* are deemed to be "dangerous weapons" within the meaning of 18 U.S.C. § 113(c) when used in a manner likely to endanger life or inflict great bodily harm. *United States v. Johnson*, 324 F.2d 264, 266 (4th Cir.1963). Thus, the term "dangerous weapon" is not restricted to such obviously dangerous weapons as guns, knives, and the like, but can include virtually any object given appropriate circumstances.

*Guilbert*, 692 F.2d at 1343.

The cases interpreting § 113(c) attest to the truth of this assertion. *Compare United States v. Martin*, 783 F.2d 1449 (9th Cir. 1986) (axe); *Phillippi*, 655 F.2d at 793 (knife); *Eagle*, 586 F.2d at 1194 (rifle); *United States v. Quinones*, 516 F.2d 1309 (1st Cir.) (machete), *cert. denied*, 423 U.S. 852, 96 S.Ct. 97, 46 L.Ed.2d 76 (1975); *United States v. Anderson*, 425 F.2d 330 (7th Cir.1970) (automobile) *with United States v. Waloke*, 962 F.2d 824 (8th Cir.1992) (metal hoe); *United States v. Williams*, 954 F.2d 204 (4th Cir.1992) (metal chair); *United States v. Pino*, 827 F.2d 1429 (10th Cir.1987) (rock); *Guilbert*, 692 F.2d at 1342–43 (broken beer bottle and pool stick); *Johnson*, 324 F.2d at 265 (plastic and metal chair); *Thornton v. United States*, 268 F.2d 583 (D.C.Cir.1959) (per curiam) (wine bottle); *Medlin v. United States*, 207 F.2d 33 (D.C.Cir.1953) (per curiam) (shoes), *cert. denied*, 347 U.S. 905, 74 S.Ct. 431, 98 L.Ed. 1064 (1954); *Hickey v. United States*, 168 F. 536 (9th Cir.1909) (revolver used as a club); *United States v. Anderson*, 190 F.Supp. 589 (D.Md.1961) (police club used as a missile).

■ Schoenborn suggests that the metal sheath is not a "dangerous weapon" under § 113(c), citing *United States v. Bey*, 667 F.2d 7 (5th Cir.1982). In that case, two prisoners were charged with, among other counts, assault with a dangerous weapon on federal officers, 18 U.S.C. § 111.[5] The assault occurred when the defendants struck prison officials with broken mop handles during an uprising. *Id.* 8–9. Special interrogatories asked the jury to find whether or not the defendants used a dangerous weapon in the assault. In addition, the judge instructed the jury on the lesser included offense of simple assault (i.e., without a dangerous weapon) under § 111. *Id.* at 10–11. The defendants were convicted of simple assault. *Id.* at 8.

On appeal, the defendants argued that the district court should not have permitted the jury to consider simple assault. This was based on their belief that, had it been presented with an "all-or-nothing proposition (guilty of assault with a dangerous weapon or not guilty of any assault), the jury might well have acquitted." Instead, the jury "was permitted to reach a compromise that was not supported by the evidence." *Id.* at 11. This evidence, according to the defendants, showed that the mop handles were necessarily dangerous weapons, thus the jury could only find either that the defendants had assaulted the prison officials with dangerous weapons or had committed no assault whatsoever. *Id.*

The Fifth Circuit rejected this claim, holding that the evidence could support conviction for simple assault under two possible theories. First, the jury could have credited the testimony of an inmate who did not participate in the uprising and who stated that

---

**5.** Section 111 punishes one who "forcibly assaults, resists, opposes, impedes, intimidates, or interferes with" a United States prison official in the performance of his duties. Use of a "deadly or dangerous weapon" in the commission of such acts results in an increased penalty under the statute.

he saw no mop handles. *Id.* Second, the court pointed out, whether or not an object constitutes a dangerous weapon depends on its capacity, given the manner of use, to endanger life or inflict great bodily harm. The court went on to state that "the jury could reasonably have found that the mop handles were not under the circumstances dangerous weapons. Therefore, the [district court's] instruction on the lesser included offense was proper." *Id.*

Schoenborn contends that, under *Bey,* a weapon is dangerous only if it is used to endanger life or inflict great bodily harm, and that the metal sheath he wielded is inherently less dangerous than a broken mop handle. We disagree. Whether or not an object constitutes a dangerous weapon under § 113(c) is a question of fact and necessarily depends on the particular circumstances of each case. As noted, the manner in which the object is used in the assault is determinative. When that use is "*likely* to endanger life or inflict great bodily harm," *Guilbert,* 692 F.2d at 1343 (emphasis added), § 113(c) is undoubtedly satisfied;[6] the weapon need not be employed to actually endanger the victim's life or cause great bodily harm or, indeed, any harm at all. *See Eagle,* 586 F.2d at 1196 ("Section 113(c) requires use of a dangerous weapon and specific intent to do bodily harm; harm need not have actually resulted."). This interpretation is compelled by the plain language of the statute, which requires an "intent to do bodily harm," but contains no express requirement that bodily harm in fact result.[7]

Suffice it to say that the jury in this case could easily conclude Schoenborn committed an assault with a dangerous weapon by striking Roy on the head repeatedly with the metal sheath. More important, however, untainted evidence adequately supports this finding. Indeed, we believe the jury could have relied on nothing more than Schoenborn's admission that he struck Roy with a metal sheath to find that he committed an assault with a dangerous weapon.

We also think the untainted testimony was more than sufficient to support the jury's finding that Schoenborn committed the assault without just cause or excuse beyond a reasonable doubt. Both Schoenborn and Roy testified that they exchanged no words before the altercation; Roy stated he did not see the attack coming. McKay testified that he did not hear the two men arguing before he saw them fighting. Coleman testified that he did not hear yelling or arguing before he saw Roy and Schoenborn jump off the gym stage. Schoenborn admitted that, once he entered the gym, he decided to confront Roy, who was sitting on the stage, and grabbed the metal sheath along the way. He also admitted that he may have struck Roy more than once, and that he had not sustained any cuts or injuries. This is a substantial amount of evidence from which to infer that Roy had done nothing to provoke the defendant to act as he did. *See Evans v. United States,* 442 F.2d 1031, 1032 (10th Cir.1971) (in case brought under § 113(c), rejecting defendant's claim that victim provoked assault by making threats and using abusive language a few hours earlier). Accordingly, the jury was entitled to disbelieve Schoenborn's explanation that he struck Roy reflexively because Roy reached up and grabbed him as he approached.

We conclude that the district court's error in admitting Staedtler's report was harmless in light of the other evidence presented by the government. Roy, McKay, Coleman, and Schoenborn himself provided more than enough evidence to support a finding as to each element of the crime charged. The only substantive difference between the testimony offered by these witnesses and Staedtler's report was the object used to strike Roy. Schoenborn admitted he used the metal sheath, however, and we believe that object constituted a dangerous weapon under the circumstances. Furthermore, the govern-

---

6. The district court properly instructed that "[t]he term 'dangerous weapon' is defined as any object used in a manner likely to endanger life or inflict great bodily harm."

7. Section 113(e) and (f) contain such a requirement. Section 113(e) punishes "[a]ssault by striking, beating, or wounding". Section 113(f) punishes "[a]ssault resulting in serious bodily injury".

ment did not even mention the report during closing argument, undermining any claim that Staedtler's report was the linchpin of the government's case. The record demonstrates that the untainted evidence presented by the government convincingly established a violation of § 113(c). Thus, we cannot say that the jury's decision was substantially swayed by the district court's error.

## III.

Schoenborn's final argument is that his sentence violates the Fifth and Eighth Amendments. The district court sentenced the defendant to serve five years in prison, the maximum under § 113(c). In addition, the court imposed three years of supervised release, the maximum term allowed. Title 18 U.S.C. § 3583(e)(3) authorizes a district court, if it finds that an individual has violated a condition of his supervised release, to revoke the term of supervised release and require the individual to serve all or part of the term in prison. According to the defendant, any violation of his supervised release, say for missing an appointment with his probation officer or for drinking a beer, could result in addition jail time, which means he is serving a sentence that exceeds the maximum of five years under the statute. Schoenborn cites no case to support his claim.

The short answer to this argument is that this court does not render decisions in hypothetical cases. One who invokes the jurisdiction of a federal court must establish, before all else, that he has suffered a concrete and particularized injury; a conjectural one will not do. *Banks v. Secretary of the Indiana Family and Social Services Administration,* 997 F.2d 231, 238 (7th Cir.1993) (citing *Lujan v. Defenders of Wildlife,* —— U.S. ——, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992)). *See also Love Church v. City of Evanston,* 896 F.2d 1082, 1085 (7th Cir.), *cert. denied,* 498 U.S. 898, 111 S.Ct. 252, 112 L.Ed.2d 210 (1990). The condition upon which Schoen-

born's claim depends—revocation of his supervised release—has yet to occur (and may never occur). The issue is not ripe for review; Schoenborn therefore lacks standing to raise it. *United States v. Linares,* 921 F.2d 841, 843 (9th Cir.1990); *United States v. Montenegro–Rojo,* 908 F.2d 425, 432 n. 9 (9th Cir.1990).[8]

The conviction and sentence of Sheldon Schoenborn are AFFIRMED.

---

8. We note that at least one other circuit, the ninth, has addressed an identical claim. That court squarely held that "§ 3583 authorizes the revocation of supervised release even where the resulting incarceration, when combined with the period of time the defendant has already served

for his substantive offense, will exceed the maximum incarceration permissible under the substantive statute." *United States v. Purvis,* 940 F.2d 1276, 1279 (9th Cir.1991) (footnote omitted).