**UNITED STATES of America, Appellee,**

v.

**James Darrell WESTBROOK, a/k/a Jimmy, Appellant.**

**UNITED STATES of America, Appellee,**

v.

**Shelia Yvonne WESTBROOK, a/k/a Shelia Yvonne Thorson, Appellant.**

**Nos. 89–5341, 89–5345.**

United States Court of Appeals, Eighth Circuit.

Submitted Nov. 17, 1989.

Decided Feb. 21, 1990.

---

Kathleen Caldwell, Sioux Falls, S.D. for appellant, Shelia Yvonne Westbrook.

Timothy J. Wilka, Sioux Falls, S.D., for appellant, James Darrell Westbrook.

Dennis R. Holmes, Pierre, S.D., for appellee.

*  JAMES B. McMILLAN, Senior United States District Judge for the Western District of North Carolina, sitting by designation.

Before LAY, Chief Judge, and ARNOLD, Circuit Judge, and McMILLAN,* District Judge.

McMILLAN, District Judge.

James and Shelia Westbrook were convicted of (1) conspiring to possess and distribute d,l–amphetamine (in violation of 21 U.S.C. §§ 841 and 846); (2) conspiring to manufacture d,1–amphetamine (in violation of 21 U.S.C. §§ 841 and 846); and (3) manufacturing d,1–amphetamine (in violation of 21 U.S.C. § 841).

On appeal, James Westbrook argues that the trial court[1] erred in admitting evidence of events that occurred in 1984 and in early 1985; denying his motion for a mistrial; admitting certain testimony identifying the substance at issue as amphetamine; and refusing to read a proposed jury instruction. Shelia Westbrook contends that the trial court improperly refused to sever her trial from that of her co-defendant, and that there was insufficient evidence to support the jury's verdict.

The court affirms the convictions of James and Shelia Westbrook.

## I. BACKGROUND

James and Shelia Westbrook were living in the area of Dallas, Texas in 1984. Shelia at that time was James's girlfriend; James worked as a plumber and fixed up old cars. In late 1984, James became acquainted with a group of men who had come to Texas from South Dakota: Tom Foley, Greg and Steve Hagedorn, and LeWayne Matthies. On several occasions in late 1984 and early 1985, James sold amphetamine to Tom Foley and Steve Hagedorn, who took the drug to South Dakota for distribution. Other members of the South Dakota group used James's amphetamine. Shelia was present at one spring 1985 transaction.

James Westbrook also was acquainted with a Texan named Ray Tyler, who knew how to manufacture amphetamine. In the

1.  John B. Jones, United States District Court Judge for the District of South Dakota, presiding.

early fall of 1985, James, Shelia and Tyler drove to Sioux Falls, South Dakota, where they met Tom Foley and Greg Hagedorn. Over the next three days they manufactured, or "cooked," one pound of amphetamine. Shelia assisted in the manufacturing process and helped weigh and package the drug. James distributed some of the amphetamine. After the "cook" was completed, the equipment was loaded into a U–Haul with Shelia's help and was placed in a rented storage unit. The rental agreement was in Shelia's name.

James and Shelia drove back to Texas, but later that year returned to South Dakota with Ray Tyler for another "cook." The equipment was taken out of the storage unit, and two pounds of amphetamine were manufactured. During most of this "cook," Shelia stayed at the home of Jan Hagedorn, Steve Hagedorn's wife. For two days, however, Shelia was absent from the home, and when she returned she brought a baggie of sticky amphetamine, which she shared with Jan. Shelia also explained the manufacturing process to Jan. At the completion of this "cook," James sold some of the amphetamine to Tom Foley, who distributed it in the Sioux Falls area. James and Shelia returned to Texas.

James later had a disagreement with the other members of the group, and their association was broken off. Tyler continued to manufacture amphetamine with the South Dakota residents, always using the same process. Their last "cook" occurred in December 1987. The substance manufactured on this occasion was seized by law enforcement officers, analyzed at a laboratory, and found to be d,l–amphetamine. Foley, Tyler, and the Hagedorns pleaded guilty to charges arising from their involvement in manufacturing and distributing amphetamine.

On December 2, 1988, James and Shelia Westbrook were charged with violating federal narcotics laws in connection with their 1984 and 1985 activities. The indictment charged them with *conspiring* to possess, distribute and manufacture d,l–amphetamine beginning in fall of 1984, and

*manufacturing* d,l–amphetamine in October 1985 and in December 1985. James was charged separately with *possessing and distributing* d,l–amphetamine in the spring of 1985 and in October 1985. James and Shelia pleaded not guilty to these charges.

Prior to trial, the government dismissed the charge against both defendants of manufacturing amphetamine in October 1985. Also prior to trial, Shelia filed a motion to sever her trial from that of James Westbrook. The court denied her motion. Immediately prior to jury selection, Shelia renewed her motion, and the court again denied her request. Shelia's counsel did not renew her motion for severance at any time thereafter.

After a jury trial, Shelia and James Westbrook were found guilty of conspiring to possess, distribute and manufacture amphetamine, and manufacturing amphetamine. James was acquitted of the other charges against him. Shelia was sentenced to five years imprisonment for each offense, with the sentences to be served concurrently. James was sentenced to 15 years imprisonment for each offense, with his sentences also to be served concurrently.

## II. ISSUES

### A. Admissibility of Evidence of Events Occurring in 1984 and Early 1985

Prior to trial, James Westbrook's counsel made a motion to suppress evidence of all transactions that took place in Texas. The court declined to rule on this motion before trial, and stated that it would rule on objections made at the time the challenged evidence was offered. At trial, several witnesses testified about drug transactions that took place in Texas between James Westbrook and other individuals. James's counsel did not object to any of this evidence as being outside the scope of the crimes with which he was charged. Two government witnesses testified that these transactions occurred before any plan or conspiracy had begun. Over James's objection, testimony was also admitted that James had brought a handgun with him to

a spring, 1985 drug transaction at Le-Wayne Matthies' trailer home.

James alleges that the trial court improperly admitted evidence of events that occurred in Texas in late 1984 and early 1985, before the first "cook" in South Dakota. James contends that this evidence was not relevant to prove the existence of the conspiracy or his participation in it because, as the government's own witnesses testified, these events occurred before the formation of any conspiracy. He argues instead that the Texas transactions are "other bad acts" whose admissibility is governed by Fed. R.Ev. 404(b), but that the jury was not given any limiting instructions to this effect.

■ The court first notes that no objection was raised at trial regarding admission of evidence of the Texas transactions. In this circumstance, James Westbrook cannot now claim that admission of this evidence was reversible error. *United States v. Wagoner*, 713 F.2d 1371, 1376 (8th Cir. 1983); *United States v. Price*, 464 F.2d 1217, 1218–19 (8th Cir.), *cert. denied* 409 U.S. 1040, 93 S.Ct. 522, 34 L.Ed.2d 489 (1972). This court can therefore only consider whether admission of evidence of the Texas transactions was so prejudicial as to amount to plain error. *United States v. Wagoner*, 713 F.2d at 1376.

■ Evidence of other bad acts or crimes is *not* admissible to prove character, but may be admitted "for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Fed. R.Ev. 404(b). If such evidence is allowed, the trial court must specify under which clause of Rule 404(b) it is being admitted, and should instruct the jury on the limited purpose for which it may be considered. *United States v. Harvey*, 845 F.2d 760, 762 (8th Cir.1988); *United States v. Cuch*, 842 F.2d 1173, 1176 (10th Cir.1988). However, evidence which is probative of a crime with which a defendant is charged, and not *solely* of some other uncharged crimes, is not evidence of "other bad acts." *United States v. Cerone*, 830 F.2d 938, 948 (8th Cir.1987), *cert. denied* 486 U.S. 1006, 108

S.Ct. 1730, 100 L.Ed.2d 194 (1988); *United States v. DeLuna*, 763 F.2d 897, 913 (8th Cir.1985); *United States v. Caspers*, 736 F.2d 1246, 1249 (8th Cir.1984).

Count IV of the indictment charged James Westbrook with possessing and distributing amphetamine "in or about *Spring 1985*." Testimony that James sold amphetamine in the spring of 1985 is highly relevant to whether he committed this offense and is not introduced as evidence of "other bad acts." Even though the jury ultimately acquitted James of this count, the government still had the right to introduce evidence of his conduct in an attempt to prove that he was guilty of this charge. *United States v. Caspers*, 736 F.2d at 1249.

■ Counts I and II of the indictment charged James with conspiracy to possess, distribute, and manufacture amphetamine "[c]ommencing in the *Fall of 1984* and continuing through the date of this indictment, in the State and District of South Dakota." The existence of a conspiracy is a *legal* issue that the government had the burden of establishing to the jury. Opinion testimony that the conspiracy did not begin until late 1985 did not foreclose the government from introducing evidence that the conspiracy in fact began at the time that James began to associate with the South Dakota group. Evidence showed that James became acquainted with the South Dakota residents beginning in late 1984 and on several occasions sold them amphetamine, which in turn was distributed in South Dakota. These transactions very closely preceded trips made by James, Shelia and Ray Tyler to South Dakota, where the Texans met the same group of South Dakota residents and proceeded to manufacture and distribute their own amphetamine. Therefore, evidence of the Texas transactions is also relevant to prove the conspiracy charges against James Westbrook, and the trial court did not err in admitting it.

■ James contends that, even if evidence of events occurring prior to late 1985 is admissible, evidence of his possession of the *handgun* is irrelevant to the charges

against him and that its admission was reversible error. The trial court has the discretion to determine whether evidence is relevant and will not be reversed absent a clear showing that it has abused its discretion. *United States v. DeLuna,* 763 F.2d 897; *United States v. Caspers,* 736 F.2d at 1248. This court has previously recognized that weapons are a "tool of the trade" for narcotics dealers. *United States v. Petty,* 798 F.2d 1157, 1161 (8th Cir.1986); *Lyons v. Robinson,* 783 F.2d 737, 739 (8th Cir. 1985); *United States v. Simon,* 767 F.2d 524, 527 (8th Cir.), *cert. denied* 474 U.S. 1013, 106 S.Ct. 545, 88 L.Ed.2d 474 (1985). Evidence relating to weapons is admissible to prove narcotics violations. *United States v. Petty,* 798 F.2d 1157. The fact that James Westbrook brought a gun with him to one drug transaction is relevant to show his involvement in drug activities, and was properly admitted to prove the charges against him.

### B. Cross–Examination of Character Witness Concerning Prior Conviction

■ At trial, James's older brother was called as a character witness and testified on direct examination that James was an honest man. On cross examination, the government asked the witness, "Were you aware that on September 11, 1980, he [James Westbrook] was convicted of possession of a controlled substance?" James's counsel objected to the question. The court sustained the objection, ordered the question stricken, and instructed the jury to disregard it. James argues that the improper question put to his brother was so prejudicial that he could not obtain a fair trial, and that the trial court should have declared a mistrial.

The decision whether a mistrial should be declared lies within the discretion of the trial court. *United States v. Muza,* 788 F.2d 1309, 1312 (8th Cir.1986). In reviewing the effect of the government's question on James's right to a fair trial, this court must consider the context in which the question was asked, the prejudice created, and the strength of the evidence against the appellant. *Id.* at 1312. Here, the government only asked *once* about James's

conviction, and additional character witnesses subsequently testified as to James's good character. The trial court's prompt admonition to the jury to ignore the question was sufficient to cure the prejudicial effect of the government's question. *United States v. Heater,* 689 F.2d 783, 787 (8th Cir.1982). Furthermore, the evidence that James Westbrook committed the offenses of which he was found guilty is substantial. This court concludes that any error created by the government's question was harmless beyond a reasonable doubt. *United States v. Polsinelli,* 649 F.2d 793, 797 (10th Cir.1981).

### C. Admission of Identification Testimony

■ At trial, the government asked *Tom Foley* and *Greg Hagedorn* to identify the substance that James Westbrook sold Foley in the spring of 1985. Both witnesses stated that they had used the substance, described its effects, and said that it was amphetamine. Throughout their testimony, they continued to refer to the substance at issue as amphetamine. Greg Hagedorn's first experience with amphetamine was when he used some of James Westbrook's product in the spring of 1985; Hagedorn thereafter used amphetamine daily for several months. Foley first used amphetamine only shortly before he met James Westbrook, but Foley described himself as a heavy user of amphetamine throughout 1985.

The government also asked *Jan Hagedorn* what Shelia Westbrook gave her to use during Shelia's second visit to South Dakota. Jan Hagedorn identified the substance as "crank" (a slang expression for amphetamine), but said she had never used it before that occasion. In addition, *LeWayne Matthies*, who had *no* experience using amphetamine, was permitted to testify that Tom Foley had contacted him about buying amphetamine, that Matthies had told James Westbrook that he wanted amphetamine, and that James had said he could help with the amphetamine. Matthies was *not asked to give his opinion as to the identity* of the substance. James

Westbrook's counsel repeatedly objected to these witnesses' use of the word "amphetamine."

James argues that the trial court erred in permitting these four witnesses to refer to the substance sold or manufactured as "amphetamine." He argues that their testimony is unreliable on the grounds that they did not have prior experience with amphetamine. James does *not* challenge the *sufficiency of the evidence* identifying the substance in question as amphetamine.

The identity of a controlled substance can be proved by circumstantial evidence. *United States v. Meeks*, 857 F.2d 1201, 1204 (8th Cir.1988); *United States v. Harrell*, 737 F.2d 971, 978–79 (11th Cir.1984), *cert. denied* 470 U.S. 1027, 105 S.Ct. 1392, 84 L.Ed.2d 781 (1975). Circumstantial evidence of a drug's identity may include opinion testimony of a witness who couples past use with present experience with the substance in question. *United States v. Harrell*, 737 F.2d at 978–79. Circumstantial evidence may also include the name by which members of a conspiracy referred to the substance. *United States v. Meeks*, 857 F.2d at 1204. *See also United States v. Manganellis*, 864 F.2d 528 (7th Cir.1988). The admission of testimony which may provide circumstantial evidence to identify a substance is within the discretion of the trial court, *United States v. Huddleston*, 810 F.2d 751, 754 (8th Cir.1987), and the trial court will not be reversed without finding a clear abuse of its discretion. *United States v. Cuch*, 842 F.2d at 1175.

*LeWayne Matthies* did not state that the substance *was* amphetamine. Instead, he recounted conversations between himself and co-conspirators, including James Westbrook, in which the substance was referred to as amphetamine. The fact that the co-conspirators referred to the substance as amphetamine is relevant to prove its identity. *United States v. Meeks*, 857 F.2d 1201. *Tom Foley* and *Greg Hagedorn* were asked to give their opinions as to the identity of the substance. Both men based their opinions on substantial personal experience using amphetamine throughout the time period when the conspiracy allegedly occurred.

The fact that most or all of this experience occurred *after*, rather than *before*, the witnesses first used some of James Westbrook's stock does not make their testimony so unreliable that it should not have been admitted.

■ *Jan Hagedorn* also was asked to identify the substance she consumed. The record indicates that she had no prior experience with amphetamine, and does not indicate that she had any subsequent experience with the drug. This court agrees with appellant that the government did not properly establish a foundation for her opinion and that her statement should not have been admitted. However, even if the trial court erred in this regard, there is sufficient evidence in the record that the substance was in fact d,l–amphetamine. In addition to the testimony of Tom Foley, Greg Hagedorn, and LeWayne Matthies, several other government witnesses with substantial prior use of amphetamine identified the substance as amphetamine. Laboratory analysis of the final, 1987 "cook" showed the product to be d,l–amphetamine, and Ray Tyler, who was in charge of the manufacturing process, stated that the same formula was used in every manufacturing attempt. This court therefore concludes that admission of Jan Hagedorn's identification was harmless.

### D. Refusal to Read Proposed Jury Instruction

James Westbrook's counsel requested that the court read his proposed jury instruction number 3, which, counsel stated, "set out the elements of the offense as concerns [sic] the facts of this case." The instruction read, in relevant part:

1. That defendants James Gerald [sic] Westbrook and Shelia Westbrook did knowingly and intentionally manufacture d,l–amphetamine;

2. That the substance alleged in the Indictment was in fact d,l–amphetamine.

The court denied the request to read this instruction. Instead, it read instruction number 20, which stated in relevant part:

1. That the defendants under consideration, at the time and place alleged in

the indictment, were engaged in the manufacture of d,l–amphetamine; and

2. That such defendant did so knowingly and intentionally.

James contends that his proposed instruction set forth his theory of defense, that the government was required to prove that the substance at issue was d,l–amphetamine, and that the court's failure to read the instruction is reversible error.

■ Jury instructions must accurately inform juries of the issues before them and of the permissible ways that they can resolve those issues. A defendant has a right to have an instruction read reflecting his or her theory of the case, provided that the request is made in time and that the instruction is supported by the evidence and correctly states the law. *United States v. Jerde*, 841 F.2d 818, 820 (8th Cir.1988); *United States v. Montgomery*, 819 F.2d 847, 851–52 (8th Cir.1987). However, the trial court has broad discretion in choosing the form and language of jury instructions. *United States v. Jerde*, 841 F.2d at 820; *United States v. Montgomery*, 819 F.2d at 852. The defendant does not have a right to have the jury instructed on his or her theory of the case exactly as it is proposed. *United States v. Jenkins*, 701 F.2d 850, 858 (10th Cir.1983).

■ The instruction read by the trial court and the instruction proposed by James both stated that the jury must find the defendants to have engaged in the (1) knowing and intentional (2) manufacture of (3) d,l–amphetamine. The primary difference between the instructions is a matter of *form*, not substance. James's proposed instruction contains no more detail regarding his defense than does the instruction that was read by the court. The trial court did not err in rejecting the proposed instruction.

E. Refusal to Sever Shelia Westbrook's Trial

Shelia argues that the trial court erred in failing to sever her trial from that of James. She points to the fact that the majority of the evidence presented by the government went toward proving James's participation, and she argues that the jury was incapable of compartmentalizing evidence against James Westbrook. *See United States v. Kopelciw*, 815 F.2d 1235, 1238 (8th Cir.1987). She also contends that her trial was tainted because an admission made by James's counsel was attributed to her. In his closing argument, James's counsel said that *James* was guilty of wrongdoing. The prosecutor, in his closing argument, commented on the concession made by James's counsel:

> Defense counsel for Mr. Westbrook admits that *James* was around for two cooks. That's what he told you. *He's* guilty of associating with the people that did this. That's the conspiracy at a minimum. *They* joined this group of people. *They* were the creators of this group of people. *They* were involved.

Trial Transcript at 408 (emphasis added).

■ The first question that must be addressed is whether Shelia has properly preserved this issue for appeal. If Shelia has preserved the issue, the trial court's action will be reviewed to determine whether the joinder of the trials adversely affected her substantial rights and was an abuse of discretion. *United States v. Thornberg*, 844 F.2d 573, 575 (8th Cir.), *cert. denied* 487 U.S. 1240, 108 S.Ct. 2913, 101 L.Ed.2d 944 (1988); *United States v. Miller*, 725 F.2d 462, 467 (8th Cir.1984). If, however, the issue has not been preserved, then this court can only review for plain error.

The view taken by this circuit is that a defendant who fails to renew a motion for severance at the conclusion of the government's case or at the end of trial has waived his or her demand. *United States v. Shearer*, 606 F.2d 819, 821 (8th Cir.1979). The reviewing court must evaluate whether a motion for severance has been preserved in light of two concerns: (1) the appellate court's practical ability to determine whether the appellant knew of the error and consented to it; and (2) the unfairness of reversing the trial court on an issue that it did not have the opportunity to consider. *United States v. Marin–Cifuentes*, 866 F.2d 988, 994 (8th Cir.1989); *United States v. Thornberg*, 844 F.2d at 575–76.

Shelia's motions for severance were denied prior to trial, and she never resurrected her request. Her counsel did not object to the prosecutor's closing argument. It is therefore impossible to know whether Shelia consented to the alleged error, or whether the trial court had an opportunity to rule on the issue. Under these circumstances, Shelia did not preserve the severance issue.

The plain error doctrine requires that an appellant must demonstrate that the error alleged affected substantial rights *and* was so egregious that it seriously affected the fairness of the proceedings. *United States v. Young*, 470 U.S. 1, 15, 105 S.Ct. 1038, 1046, 84 L.Ed.2d 1 (1984); *United States v. Thornberg*, 844 F.2d at 575; Fed.R.Crim.P. 52(b). On reviewing the record, this court finds that the facts of the conspiracy are not so complex that the jury could not easily have separated Shelia's role from that of James. The mere fact that the government presented a disproportionate amount of its evidence against James is not grounds for severance. *United States v. Kopelciw*, 815 F.2d 1235. Further, the prosecutor's closing argument expressly attributed the admission of wrongdoing only to James Westbrook, and not to Shelia. This statement was not unfairly prejudicial to her. Consequently, this court concludes that substantial rights of Shelia have not been affected, and that, in any event, any harm that has been alleged is not so egregious as to require reversal.

### F. Sufficiency of the Evidence

Shelia argues that there was insufficient evidence for the jury to find her guilty of the offenses for which she was charged. In reviewing the jury's verdict, the evidence must be considered in the light most favorable to the government. *United States v. Marin–Cifuentes*, 866 F.2d at 992. Shelia's conviction can only be overturned if this court concludes that a reasonable fact-finder could not have found her guilty beyond a reasonable doubt. *United States v. Shurn*, 849 F.2d 1090, 1093 (8th Cir.1988).

Shelia was found guilty of conspiring to possess, distribute and manufacture amphetamine, and manufacturing amphetamine. "Manufacture" includes processing and packaging a substance. 21 U.S.C. § 802(15). "Distribution" is defined to mean delivery of a controlled substance. 21 U.S.C. § 802(11). To prove conspiracy, the government is required to show beyond a reasonable doubt (1) the *existence* of a conspiracy; (2) Shelia's *knowledge* of the conspiracy; and (3) Shelia's *voluntary participation* in it. *United States v. Lewis*, 759 F.2d 1316, 1352 (8th Cir.1985).

After reviewing the evidence, this court concludes that there was sufficient evidence for the jury to find Shelia guilty of all three charges. In 1985 Shelia travelled to South Dakota with James Westbrook and Ray Tyler, helped unload equipment used in manufacturing amphetamine, was present during the "cook," and weighed and bagged the final product with James. Shelia rented the storage unit in which the equipment was then stored. Later in 1985 she returned to South Dakota with James and Ray Tyler and stayed with Jan Hagedorn. At one point during this visit Shelia left Jan Hagedorn's home for two days, and when she returned she brought damp amphetamine, some of which she gave to Jan Hagedorn. Shelia also explained to Jan how the manufacturing process worked. The evidence shows that Shelia participated in manufacturing amphetamine; it also shows the existence of the conspiracies, Shelia's knowledge of the conspiracies, and her participation in them.

The convictions of James Westbrook and Shelia Westbrook are AFFIRMED.