**Charles CAMPBELL, Defendant Below, Appellant,**

v.

**STATE of Delaware, Plaintiff Below, Appellee.**

No. 294, 2008.

Supreme Court of Delaware.

Submitted: March 11, 2009.
Decided: May 27, 2009.

Patrick J. Collins, Law Office of Patrick J. Collins, Wilmington, DE, for appellant.

James T. Wakley and Danielle J. Brennan (argued), Department of Justice, Wilmington, DE, for appellee.

Before STEELE, Chief Justice, HOLLAND and BERGER, Justices.

STEELE, Chief Justice:

In this appeal from the Superior Court, Charles Campbell seeks to reverse his convictions for Trafficking in Methamphetamine and Delivery of a Schedule II Controlled Substance. Campbell raises three issues on appeal: (1) whether the trial judge abused his discretion by admitting evidence related to a future drug deal and whether the jury instruction related to that evidence was proper; (2) whether the trial judge abused his discretion by permitting a downstream purchaser to identify the substance he received as methamphetamine; and (3) whether the trial judge abused his discretion by allowing the State to present rebuttal evidence. Because the judge acted within his discretion by: (1) admitting evidence of a common plan or scheme; (2) permitting a lay witness to render an opinion on a matter rationally based on his own perception; and (3) allowing the State to rebut testimony presented by the defense, we **AFFIRM**.

### FACTS AND PROCEDURAL HISTORY

In October 2006, the Delaware State Police (DSP) set up a wiretap on Raul Morales' phone as part of a drug investigation. DSP also placed a GPS tracker on Morales' car and set up surveillance on him. During the investigation, DSP determined that Charles Campbell was supplying methamphetamine to Morales who in turn sold it to two purchasers, Michael Kanich (a/k/a Hippie) and Billie Gillespie.[1] From the wiretap, DSP overheard Morales call Campbell to arrange the purchases. From the GPS tracker, DSP learned that Morales drove to Campbell's house at 1 Liberty Street in Port Penn and stayed for 15 to 20 minutes. From the surveillance they conducted, DSP saw Morales meet Kanich at the Grotto's Pizza on Pennsylvania Avenue in Wilmington to sell Kanich methamphetamine.[2]

Morales testified at trial that he purchased methamphetamine from Campbell four times in October 2006. Morales also

---

1. Billie Gillespie died before trial.

2. At first, Kanich testified that he bought methamphetamine from Morales at Amtrak's parking lot and at Morales' house. He testified that when he met Morales in the Grotto's parking lot, they were exchanging scrap metal and boiler plates for a home project. Kanich later testified that he met Morales at Grotto's to buy methamphetamine and pick up the boiler plates and scrap metal.

testified that a fifth exchange was scheduled for the weekend of November 3, 2006. Morales testified that he called Campbell and asked to pick up the methamphetamine Friday night November 3, 2006, but Campbell refused because he had to wake up early the next morning for a trip with his wife. Morales testified that he then called his buyer Kanich to tell him that the purchase was cancelled.

That November 3rd weekend, DSP obtained a search warrant and searched Campbell's house while he was out of town. DSP executed other search warrants in connection with the drug investigation that weekend. DSP arrested Morales and Campbell. These arrests thwarted the potential November 3rd weekend transaction.

A Grand Jury indicted Campbell on four counts of Trafficking in Methamphetamine, 5 to 50 grams, and four companion counts of Delivery of Methamphetamine based on four separate occasions in October 2006. The first six counts alleged that Campbell was trafficking and delivering on unspecified dates before October 25, 2006. Counts seven and eight alleged that Campbell was trafficking and delivering on October 26, 2006. The State originally charged Morales as a codefendant, but dropped the charge because Morales testified against Campbell as part of a "plea agreement and the promise of a substantial assistance motion."

Campbell presented two motions *in limine* at his pretrial conference. First, Campbell objected to Kanich identifying the substance as methamphetamine and speculating about its weight. Campbell sought to exclude Kanich's testimony. The State wanted to introduce the testimony to prove that the substance was meth-

amphetamine and that Campbell sold it to Morales who sold it to Kanich. The State argued that Kanich could identify the methamphetamine and its weight as a lay witness based on *Wright v. State*.[3] The trial judge overruled Campbell's objection by stating: "this case is stronger than *Wright*." Kanich testified at trial that the substance he purchased from Morales was methamphetamine. Kanich described how methamphetamine affected him and how it affected him differently than cocaine. Kanich testified that until five or six years ago he used methamphetamine once or twice a month for about 15 to 20 years. Kanich and Morales worked together at Amtrak. Morales approached him to offer to sell him methamphetamine. Kanich testified that he bought methamphetamine from Morales twice. He testified that he had never met Campbell before.

Second, Campbell argued that evidence of the fifth methamphetamine transaction that was scheduled for the weekend of November 3, 2006 and never took place was not admissible under Delaware Rule of Evidence 404(b). D.R.E. 404(b) prohibits evidence of "other crimes, wrongs or acts" by the defendant "to prove the character of a person in order to show action in conformity therewith."[4] D.R.E. 404(b) permits evidence of "other crimes, wrongs or acts" "for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident."[5] The State argued that evidence of Campbell's plans for the future methamphetamine transaction was admissible "pursuant to the same scheme that has been manifested in the deal on [October 26] and in the prior deliveries." The trial judge denied Campbell's second motion *in limine* and held that "the evi-

3. *Wright v. State*, 953 A.2d 188 (Del.2008).

4. D.R.E. 404(b).

5. *Id.*

dence does not offend Rule 403 or 404(b). It's evidence of a plan or scheme which is clearly admissible under Rule 404(b). . . ." At trial, the trial judge instructed the jury, according to Campbell's requested instruction, that they could consider the evidence about the later planned drug transaction only as evidence of intent.

In its case in chief, the State offered GPS printouts that placed Morales' truck between 980 and 1099 Port Penn Road in Middletown on October 26, 2006. Campbell lived at 1 Liberty Street in Port Penn, Middletown. The State called Detective Ellingsworth to testify that DSP attached a GPS tracker to Morale's truck. The State called Detective Clemons to testify that 1099 Port Penn Road is where Liberty Street, Port Penn Road, and Route 9 intersect.

To corroborate the GPS evidence, the State called Morales. Morales testified that in late October he drove to Campbell's house to pick up more methamphetamine. Morales testified that he parked his truck in Campbell's driveway at 1 Liberty Street.

During Campbell's cross examination of Morales, he entered Defense Exhibit 2, a Google satellite map of the Port Penn area, into evidence. Campbell asked Morales if he remembered stopping at the area indicted on the map as 980 Port Penn Road. Morales said that he did not remember stopping there. On redirect, Morales testified that the only reason he would have stopped there would be to make a phone call. During his defense, Campbell testified that Morales did not come to his house on October 26.

In the State's rebuttal, the State called Detective Chorlton to rebut Defense Ex-

hibit 2. Detective Chorlton testified that when he entered the GPS coordinates into MapQuest the resultant GPS coordinates corresponded to the intersection of Port Penn Road and Route 9. This intersection is in the vicinity of Campbell's house.

The jury convicted Campbell on one count each of Trafficking in Methamphetamine (count seven) and Delivery of Methamphetamine (count eight) based on the transaction that took place on October 26, 2006. They acquitted him on the other charges.

## ANALYSIS

### I. The Trial Judge Properly Admitted Evidence of a Future Drug Deal.

■ Campbell argues that the trial judge improperly admitted later bad acts evidence. Campbell claims that a "major focus of the trial" was evidence of a drug transaction that was planned to occur over the November 3, 2006 weekend. Campbell contends that the trial judge committed legal error in his application of the *Getz* analysis and D.R.E. 404(b). The trial judge admitted evidence of this uncharged, planned transaction because it was "evidence of a plan or scheme," under D.R.E. 404(b). We review for abuse of discretion a trial judge's admission of evidence that is relevant for some purpose other than to prove the defendant's propensity to commit crimes pursuant to D.R.E. 404(b).[6]

D.R.E. 404(b) forbids the State from introducing character evidence solely to prove that a defendant acted in conformance with his propensity to commit bad acts.[7] In *Getz*, we established the following guidelines for the admissibility of evidence subject to D.R.E. 404(b):

---

**6.** *Hicks v. State,* 913 A.2d 1189, 1196 (Del. 2006); *Pope v. State,* 632 A.2d 73, 78–79 (Del. 1993).

**7.** D.R.E. 404(b).

(1) The evidence of other crimes must be material to an issue or ultimate fact in dispute in this case. If the State elects to present such evidence in its case-in-chief it must demonstrate the existence, or reasonable anticipation, of such a material issue. (2) The evidence of other crimes must be introduced for a purpose sanctioned by Rule 404(b) or any other purpose not inconsistent with the basic prohibition against evidence of bad character or criminal disposition. (3) The other crimes must be proved by evidence which is "plain, clear and conclusive." (4) The other crimes must not be too remote in time from the charged offense. (5) The court must balance the probative values of such evidence against its unfairly prejudicial effect, as required by D.R.E. 403. (6) Because such evidence is admitted for a limited purpose, the jury should be instructed concerning the purpose for its admission as required by D.R.E 105.[8]

Campbell asserts that the trial judge: (1) failed to completely address the materiality prong; (2) did not address the 'plain, clear and conclusive' prong; and (3) improperly instructed the jury to consider evidence of intent instead of evidence of a plan or scheme.

The State suggests that the evidence of the planned November 3rd transaction could be admitted after a simple relevancy analysis because the transaction did not in fact occur and thus no bad act occurred. This suggestion over simplifies the evidence. Though the planned transaction did not occur, it was proffered to show that Campbell and Morales engaged in an ongoing drug enterprise. The State introduced the evidence as one part of several ongoing bad acts under the rubric of D.R.E. 404(b)'s plan or scheme exception. The fact that the planned transaction did not occur is relevant to whether the State offered "plain, clear and conclusive" evidence, but not on the issue whether the State offered it as an intention to commit a bad act in the future. Therefore, we will subject this evidence to a *Getz* analysis.

### A. Materiality Prong of Getz Test.

■ To support his criticism of the trial judge's analysis of the materiality prong, Campbell relies on our holding in *Deshields v. State*.[9] In *Deshields*, we quoted *Getz's* holding that "no evidential purpose is served by proof that the defendant committed other intentional acts of the same type."[10] The State replies that "it is clear that this evidence was material to an ultimate issue in dispute in this case: whether Campbell was trafficking and delivering methamphetamine to Morales." The State claims that the evidence is vital to explain Campbell's trafficking plan and operation because the State could not recover physical evidence and only recorded one wire-tapped conversation about delivery (October 26), which did not refer to Campbell.

■ *Getz* and D.R.E. 404(b) permit later bad acts evidence under certain conditions.[11] Where the evidence of a later bad act is offered for a proper purpose, like plan or scheme, the trial judge should engage in the *Getz* analysis.[12] Evidence of other bad acts is admissible when those acts have "independent logical relevance" and when their "probative value is not substantially outweighed by the danger of

8. *Getz v. State*, 538 A.2d 726, 734 (Del.1988).

9. *Deshields v. State*, 706 A.2d 502 (Del.1998).

10. *Id.* at 508 (quoting *Getz*, 538 A.2d at 733).

11. *Getz v. State*, 538 A.2d 726, 730 n. 3 (Del. 1988); *see Joynes v. State*, 797 A.2d 673, 675–76 (Del.2002).

12. *Joynes*, 797 A.2d at 675–76.

unfair prejudice."[13] "The evidence of the prior bad act must be logically related to the material facts of the case."[14] In *Getz*, we held that "evidence of other crimes must be material to an issue or ultimate fact in dispute in the case."[15]

The planned November 3rd transaction has independent logical relevance because it is material to identifying Campbell as part of a trafficking scheme. The probative value of identifying Campbell as the supplier outweighs the prejudice of notifying the jury about the later bad act. In this case, the State did not prefer evidence of the future deal for the purpose of showing Campbell's bad character but instead to show that Campbell was engaged in ongoing drug deals.[16] This evidence allowed the jury to evaluate the evidence in this case to determine whether Campbell engaged in trafficking as well as delivery of methamphetamine. The evidence of a future drug deal is sufficiently material to satisfy *Getz*.

## B. *Plain, Clear and Conclusive Prong of Getz Test.*

■ Campbell contends that "the trial court also committed legal error by not conducting any analysis under the 'plain, clear and conclusive prong' of the *Getz* test" before admitting evidence of Morales' November 3rd phone call to Campbell. Campbell asserts that the November 3rd telephone call that the State characterizes as an attempt to arrange a drug buy does not present clear and conclusive evidence that Campbell possessed methamphetamine. Campbell maintains that the telephone call transcript indicates that

"Campbell gave no assent to any drug transaction." There was no mention of drugs in the transcript. To bolster their argument for admitting Morales's November 3rd call to Campbell, the State offered Morales' testimony about calling his cocaine supplier Angel Torres on November 3rd. Morales testified that he called Torres the same evening he called Campbell to tell Torres that it was too late in the evening for Morales to travel to Philadelphia to purchase Torres' cocaine. Campbell denies that Morales' testimony about his conversation with Angel Torres provided plain, clear and conclusive evidence that he possessed methamphetamine on November 3rd.

The State also offered GPS tracking evidence to show that Morales was in the vicinity of Campbell's house on the same date that Morales testified he went to pick up drugs from Campbell. The State insists that the GPS tracking evidence and the wiretap corroborated Morales' testimony. Campbell emphasizes that DSP did not recover any drugs or drug paraphernalia from his house that weekend while Campbell was out of town and unaware of the search warrant. Campbell complains that Morales' wiretapped phone call to him is not plain, clear and conclusive evidence of a drug trafficking scheme.

The State suggests that "[t]estimony alone is sufficiently plain, clear and conclusive." The State relies on *Lloyd v. State*[17] for the proposition that testimony standing alone is enough to support an element of a crime. In *Lloyd*, we held that testimony sufficient to support an element of a crime must also be sufficient to show reliability

---

13. *Getz*, 538 A.2d at 730 (citing D.R.E. 403; *Diaz v. State*, 508 A.2d 861, 865 (Del.1986)).

14. *Ruiz v. State*, 2003 WL 1824840, at *3 (Del.) (citing *Getz*, 538 A.2d at 731).

15. *Getz*, 538 A.2d at 734.

16. *See Deshields v. State*, 706 A.2d 502, 507–508 (Del.1998).

17. *Lloyd v. State*, 1991 WL 247737 (Del.).

under the "plain, clear and conclusive" standard articulated in *Getz*.[18] Our standard of review is abuse of discretion and we will not disturb the trial judge's ruling if it is based on conscience and reason, as opposed to being arbitrary and capricious.[19] Testimony implicating a person's plan to meet to sell drugs could support a criminal conviction for trafficking. The November 3rd phone call transcript is consistent with the GPS tracking evidence and Morales' testimony. Therefore, the evidence of a future drug deal is sufficiently plain, clear, and conclusive to satisfy *Getz*.

### C. *The Instruction Prong of the Getz Test.*

■ The third *Getz* factor Campbell quarrels with is the jury instructions. The trial judge left it up to defense counsel to fashion an instruction. *Getz* requires a trial judge to instruct the jury about the specific purpose for which they can use the bad acts evidence.[20] The jury instruction, submitted by Campbell, states:

> You have heard evidence in this trial alleges [sic] that the defendant was involved in acts subsequent to the offense charged. You may not use that evidence as proof that the defendant is a bad person and, therefore, probably committed the offenses charged in ·the indictment. You may only consider subsequent acts evidence to help you in deciding whether the defendant possessed the requisite intent to commit the acts for which he is now on trial. Again,

you are not to consider the alleged subsequent bad acts as proof that the defendant is a person of bad character.

Campbell argues that the use of the word "intent" instead of "plan" or "scheme" was reversible error. Neither party nor the trial judge objected to the instruction.

■ Jury instructions are not grounds for reversal if they are "reasonably informative and not misleading."[21] Some inaccuracies in jury instructions are permissible.[22] A jury instruction is grounds for reversal only when the "deficiency undermined the ability of the jury 'to intelligently perform its duty in returning a verdict.'"[23] All jury instructions will be reviewed as a whole.[24]

Campbell argues that we should find his case analogous to *Milligan v. State*,[25] in which we found the trial court's cryptic reference to "another proper purpose" in the jury instructions was, as a matter of law, reversible error.[26] In *Milligan*, we found the jury instructions were not specific enough to limit the jury's consideration to the proper purpose for which the evidence had been admitted.[27] Campbell argues that the trial judge admitted the bad acts evidence for "plan or scheme," and therefore, it was improper to instruct the jury to consider the bad acts for "intent." Campbell emphasizes that "intent" is an element of the charged offenses unlike "plan" or "scheme." Campbell contends that "intent" focuses prospectively on the acts to show evidence of a defen-

**18.** *Id.* at *3.

**19.** *Id.* at *1 (citing *Pitts v. White*, 109 A.2d 786 (Del.1954)).

**20.** *Getz*, 538 A.2d at 734 (citing D.R.E. 105).

**21.** *Floray v. State*, 720 A.2d 1132, 1137 (Del. 1998) (internal citation omitted).

**22.** *Id.* at 1138.

**23.** *Id.* (internal citation omitted).

**24.** *Id.*

**25.** *Milligan v. State*, 761 A.2d 6 (Del.2000).

**26.** *Id.* at 10.

**27.** *Id.* at 9.

dant's specific intent to do the bad act, which in this case was the future November 3rd weekend deal. Campbell distinguishes "plan" or "scheme" by claiming that those terms focus retrospectively to show evidence of a defendant's ongoing plan to do bad acts like the charged offense. His concern is that the jury found him guilty of the one offense that occurred only a few days before the alleged later bad act because the jury was allowed to infer that he had a specific intent to engage in that later bad act. Whereas, if the jury was instructed to determine if he had "plan[ned]" or "scheme" to engage in the later bad act, then Campbell might not have been found guilty on the one charge because the jury acquitted him on all the similar charges and having done so could not have believed that he engaged in an ongoing plan or scheme.

Campbell's reliance on *Milligan* is misplaced because his jury instructions stated specifically that the jury should limit their consideration of the alleged bad acts to "whether the defendant possessed the requisite intent to commit the acts for which he is now on trial." The evidence of later bad acts was admitted as evidence of a plan or scheme. We fail to comprehend Campbell's distinction between whether he "intended to" or "planned to" arrange a future drug deal. The jury instructions were specific enough to limit the jury's consideration of the evidence to the purpose for which it was admitted. In the context of jury instructions as a whole, the trial judge's use of defense counsel's wording did not constitute error.

## II. The Trial Judge Properly Admitted Lay Testimony by a Downstream Purchaser to Establish the Substance Ingested was Methamphetamine.

 Campbell argues that the trial judge abused his discretion by admitting Kanich's lay witness testimony to prove beyond a reasonable doubt that the substance Kanich purchased from Morales was methamphetamine. We review evidentiary rulings for abuse of discretion.[28]

Campbell notes that DSP did not seize any drugs and no expert identified the alleged methamphetamine that Campbell was convicted of trafficking and delivering. In order to establish that the substance Kanich ingested was methamphetamine, the State relied on Kanich's testimony that after swallowing the drug, he experienced the same effects as he had experienced over his 15 to 20 years of methamphetamine use. The State also relied on Kanich's testimony that Morales told Kanich that he was going to give Kanich some crank, which is a nickname for methamphetamine. Before trial, Campbell objected in a motion *in limine* to Kanich testifying to the identity and the weight of the substance.[29] The State defended their use of the lay testimony to identify a controlled substance by relying on *Wright v. State.*[30]

When a lay person gives opinion testimony it must be consistent with D.R.E. 701:

> If the witness is not testifying as an expert, the witness' testimony in the

**28.** *Manna v. State*, 945 A.2d 1149, 1153 (Del. 2008).

**29.** Because the State proffered that Kanich would testify that he purchased half an ounce from Morales and the minimum for trafficking is only five grams, the trial judge permitted Kanich to testify about the weight of the substance. Campbell restricts his appeal to

the trial judge's discretion in allowing Kanich to identify the substance. Thus, we do not analyze the trial judge's decision to permit Kanich to testify about the weight of the substance.

**30.** *Wright v. State*, 953 A.2d 188 (Del.2008).

form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue and (c) not based on scientific, technical or other specialized knowledge within the scope of Rule 702.[31]

Campbell argues that *Wright v. State*[32] does not apply to his case because the main issue in *Wright* was whether Delaware's *corpus delicti* rule prohibited the State's conviction for delivery of cocaine based on the defendant's confession. We explained in *Wright* that the State had produced sufficient evidence, beyond Wright's confession that he sold cocaine, to satisfy the corpus deliciti rule.[33] The corpus deliciti rule requires the State to present "some evidence of the existence of a crime, independent of the defendant's confession, to support the conviction."[34] In *Wright*, Raheem Cannon supplied cocaine to Wright. Cannon testified that the substance he sold to Wright, and which Wright later sold in the transaction for which he was charged with delivery of cocaine, was in fact cocaine. Cannon testified that he had been selling cocaine on a daily basis for about two years, and that, although he never used cocaine, he knew that the substance he placed in a small baggie and gave to Wright was cocaine because "[i]f you deal with it every day,

you can just tell from the texture and the smell and just the look of it."[35] Cannon testified that he had received the cocaine from someone else and divided it into smaller portions, which he put in plastic baggies.[36] He testified that the cocaine was a mixture of powder and chunks and had a "fuelly smell" like gasoline.[37] He also testified that no one had ever complained that he had sold fake cocaine.[38] The police never recovered any cocaine in that case.[39] We found that the dealer's description and familiarity with the substance was sufficient evidence, beyond Wright's confession that he sold cocaine, to satisfy the corpus deliciti rule.[40]

*Wright* applies to this case because in *Wright* we considered "whether, in the absence of chemical testing or expert testimony, a lay witness can identify an illegal substance sufficient to support a jury finding."[41] We noted that at least three United States Courts of Appeals have accepted lay opinion testimony to identify a controlled substance.[42]

In *United States v. Dominguez*, the first case we cited in *Wright*, the United States Court of Appeals for the Seventh Circuit stated: "It is well established that the government need not prove the identity of a controlled substance by direct evidence, as long as the available circumstantial evidence establishes its identity beyond a rea-

---

31. D.R.E. 701.

32. *Wright v. State*, 953 A.2d 188 (Del.2008).

33. *Id.* at 190.

34. *Id.* at 192.

35. *Id.* at 190.

36. *Id.* at 190–91.

37. *Id.* at 191.

38. *Id.*

39. *Id.*

40. *Id.* at 190.

41. *Id.* at 194.

42. *Id.* at 194–195 (citing *U.S. v. Dominguez*, 992 F.2d 678, 681 (7th Cir.1993); *U.S. v. Westbrook*, 896 F.2d 330, 336 (8th Cir.1990); *U.S. v. Paiva*, 892 F.2d 148, 157 (1st Cir. 1989)).

sonable doubt."[43] The court explained in *Dominguez* that "[c]ircumstantial evidence establishing identification may include a sales price consistent with that of cocaine; the covert nature of the sale; on-the-scene remarks by a conspirator identifying the substance as a drug; lay-experience based on familiarity through prior use, trading, or law enforcement; and behavior characteristic of drug sales."[44] In that case, the government failed to establish the identity of the controlled substance by circumstantial evidence because "the record is unclear as to what [the investigating agent's] considered which eventually convinced him that the delivered substance was cocaine."[45] The court determined that there was no factual basis in the record to support the agent's belief that the substance was cocaine, and no evidence that another agent, who accepted delivery of the substance as part of the investigation, "was experienced in identifying cocaine."[46] Instead, the agent who had accepted delivery of the cocaine "was uncertain whether the substance she received was authentic."[47] The court concluded that the other circumstantial evidence the government presented, that the agreed upon price was $12,000, which was consistent with the market rate for the quantity purchased, and that the transaction was conducted in a covert manner, with delivery in Guatemala and payment in Milwaukee, "could as easily support the existence of a sham drug sale as an authentic one."[48]

The court in *Dominguez* explained that the evidence presented was "distinguishable from those cases in which the identity of the substance was established by circumstantial evidence."[49] For example, in one of those cases, a co-conspirator testified that she knew that the drug she received from the defendant was cocaine because the defendant told her it was and she tried it.[50] In two other cases, the co-conspirators testified that they had smoked marijuana for five to ten years and the substance they received from the defendant to sell "looked, smelled and smoked like marijuana."[51]

In *United States v. Westbrook*, the second case we cited in *Wright*, the defendant argued on appeal that the trial judge erroneously permitted four witnesses to refer to the substance sold or manufactured as "amphetamine" because, he argued, their testimony was "unreliable on the grounds that they did not have prior experience with amphetamine."[52] The defendant did not, however, challenge the sufficiency of the evidence identifying the substance as amphetamine.[53] The United States Court of Appeals for the Eighth Circuit explained that "[t]he identity of a controlled substance can be proved by circumstantial evidence"[54] and "[c]ircumstantial evidence

43. *U.S. v. Dominguez*, 992 F.2d at 681 (citing *U.S. v. Manganellis*, 864 F.2d 528, 541 (7th Cir.1988)).

44. *Id.*

45. *Id.*

46. *Id.*

47. *Id.*

48. *Id.*

49. *Id.*

50. *Id.* at 681–82 (citing *U.S. v. Manganellis*, 864 F.2d at 541).

51. *Id.* at 682 (citing *U.S. v. Murray*, 753 F.2d 612, 615 (7th Cir.1985); *U.S. v. Roman*, 728 F.2d 846, 859 (7th Cir.), *cert. denied*, 466 U.S. 977, 104 S.Ct. 2360, 80 L.Ed.2d 832 (1984)).

52. *U.S. v. Westbrook*, 896 F.2d 330, 336 (8th Cir.1990).

53. *Id.*

54. *Id.* (citing *U.S. v. Meeks*, 857 F.2d 1201, 1204 (8th Cir.1988); *U.S. v. Harrell*, 737 F.2d 971, 978–79 (11th Cir.1984)).

of a drug's identity may include opinion testimony of a witness who couples past use with present experience with the substance in question."[55] The court in *Westbrook* relied on a case from the United States Court of Appeals for the Eleventh Circuit, *United States v. Harrell*, in which that court explained that "[i]dentification of a controlled substance does not require direct evidence if available circumstantial evidence establishes its identity beyond a reasonable doubt" and "[s]uch evidence can include lay experience based on familiarity through prior use, trading or law enforcement; a high sales price; on-the-scene remarks by a conspirator identifying the substance as a drug; and behavior characteristic of sales and use such as testing, weighing, cutting and peculiar ingestion."[56] The *Harrell* court further explained that the testimony to which the defendant objected in that case was permissible because "[i]dentification based on past use coupled with present observation of the substance at hand will suffice to establish the illicit nature of a suspected substance"[57] and the witness had "testified that he became a user and pusher of an assortment of drugs, including cocaine, amphetamines, and quaaludes" in the past before working with the defendant on the drug transactions at issue in the case.[58]

The *Harrell* court held that the witness's past experience qualified him to testify about the drug transactions he participated in with the defendant to sell cocaine and quaaludes.[59] In addition, another witness admitted in his testimony that he had become a frequent cocaine user before meeting the defendant.[60] The *Harrell* court held that the second witness's "testimony of habitual use coupled with observations of [the defendant's] characteristic behavior qualified [that witness] to identify the substance that he observed [the defendant] snorting."[61]

In *United States v. Paiva*, the third case we cited in *Wright*, the defendant argued on appeal that the trial judge abused his discretion when he permitted a lay witness to testify that, in her opinion, the identity of a substance allegedly distributed by the defendant was, in fact, cocaine.[62] The lay witness was the 21 year old daughter of the defendant's ex-wife.[63] She testified that while she lived with the defendant and her mother in Florida, she found a plastic bag with white powder inside of the defendant's shoes.[64] She testified that, before that time, "she had used and tasted cocaine on many occasions and had developed a cocaine problem at age fourteen."[65] She testified that the substance she found in the defendant's shoe was a white powder with little bits of rocks in it and that she tasted the powder and it tasted like cocaine.[66] The witness testified "that based upon looking at the substance and

---

55. *Id.* (citing *U.S. v. Harrell*, 737 F.2d at 978–79).

56. *Harrell*, 737 F.2d at 978.

57. *Id.* at 978–79.

58. *Id.* at 979 n. 9.

59. *Id.*

60. *Id.*

61. *Id.*

62. *U.S. v. Paiva*, 892 F.2d 148, 155 (1st Cir. 1989).

63. *Id.*

64. *Id.* at 155–56.

65. *Id.* at 156.

66. *Id.*

tasting it, the substance, in her opinion, was cocaine."[67]

In *Paiva*, the defendant argued on appeal, as he had argued before trial in his motion *in limine*, that the witness' testimony was inadmissible under Federal Rule of Evidence 701 "because identification of a substance, such as cocaine, is beyond the common knowledge of ordinary persons" and also under Federal Rule of Evidence 702 because the government had not qualified the witness as an expert.[68] In *Paiva*, the court explained that the admissibility of lay opinion testimony under Rule 701 is within the sound discretion of the trial judge and would not be overturned absent a clear abuse of discretion.[69] The court held that a drug user testifying as a lay witness, who had not been qualified as an expert, was competent to express an opinion about the identity of a particular controlled substance.[70] Accordingly, the court in *Paiva* concluded that the admission of the witness' testimony "that the substance she found in [the defendant's] shoe looked and tasted like cocaine was clearly proper and within the trial judge's discretion."[71] In addition, the witness' "definite opinion identifying the white powder as cocaine" was also properly admitted.[72] The court rejected the defendant's argument that "identification of a substance, such as cocaine, is exclusively within the domain of expert opinion evidence and an improper subject for lay opinion testimony."[73] Instead, the court held that "[a]lthough a drug user may not qualify as an expert, he or she may still be competent, based on past experience or personal knowledge and observation, to express an opinion as a lay witness that a particular substance perceived was cocaine or some other drug."[74]

Delaware Rule of Evidence 701 tracks the federal rule and it was amended in 2001 to be consistent with the 2000 amendments to the federal rule.[75] Federal Rule of Evidence 701 permits a drug user to testify about the identity of a controlled substance as long as the government lays a foundation that the witness' testimony is rationally based on his own perception of and personal experience with the substance and not on scientific, technical or

67. *Id.*

68. *Id.*

69. *Id.*

70. *Id.* (citing *U.S. v. Honneus*, 508 F.2d 566, 576 (1st Cir.1974), *cert. denied*, 421 U.S. 948, 95 S.Ct. 1677, 44 L.Ed.2d 101 (1975)).

71. *Id.*

72. *Id.*

73. *Id.* at 157.

74. *Id.* (internal citations omitted).

75. D.R.E. 701 cmt. (2001) ("D.R.E. tracks F.R.E. 701 in effect on December 31, 2000."). Fed.R.Evid. 701 (2000) provides:
If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.
Fed.R.Evid. 701.
D.R.E. 701 (2001) similarly provides:
If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue and (c) not based on scientific, technical or other specialized knowledge within the scope of Rule 702.
D.R.E. 701.

other specialized knowledge.[76]

Kanich was a 15 to 20 year methamphetamine user[77] who testified that he purchased the substance in question from Morales on two occasions and ingested the substance on both occasions.[78] Morales told Kanich that the substance was methamphetamine.[79] He testified that the substance looked, felt, and tasted the same as the methamphetamine he had used in the past.[80] He also testified that the substance had the same effect when he ingested it as the methamphetamine that he had ingested in the past.[81] He testified that he had tried cocaine and that the substance gave him different effects than from cocaine. Therefore, the State laid a sufficient foundation that Kanich had past experience with methamphetamine and present knowledge of the substance at issue in this case to testify that the substance he obtained from Morales was in fact methamphetamine. Accordingly, the trial judge correctly concluded that a suffi-cient foundation existed for the lay opinion and did not abuse his discretion when he admitted Kanich's testimony that the substance delivered was methamphetamine.[82]

## III. The Trial Judge Properly Allowed Rebuttal Evidence.

▇▇▇▇▇ Campbell argues that the trial judge allowed the State to argue improper rebuttal testimony about GPS tracking evidence. We review whether the trial judge admitted rebuttal testimony improperly under an abuse of discretion standard of review.[83] The trial judge has discretion to craft the order in which the parties present evidence—and thus, the proof—at trial.[84] To that end, "it is entirely proper for the affirmative side to give evidence in rebuttal in reply to the evidence of the other side of the case."[85]

Campbell complains that Detective Chorlton's testimony had no purpose other than to rebut an exhibit that Campbell's counsel presented during the State's case-

**76.** Fed.R.Evid. 701.

**77.** *See e.g., U.S. v. Harrell,* 737 F.2d 971, 979 n. 9 (11th Cir.1984) (testifying as a habitual user).

**78.** *See e.g., U.S. v. Dominguez,* 992 F.2d 678, 681–82 (7th Cir.1993) (knowledge from tasting the substance).

**79.** *Id.* (dealer acknowledged identity of substance to witness).

**80.** *See e.g., Wright v. State,* 953 A.2d 188, 190 (Del.2008) (witness was familiar of the substance's smell, texture, and appearance).

**81.** *See e.g., Harrell,* 737 F.2d at 979 n. 9 (testifying to the drug effects).

**82.** In contrast, a police officer does not usually have past experience with drug use or present personal knowledge of the substance at issue. Therefore, this Court properly held in *Norman v. State,* that "police officers must be qualified as experts before identifying a controlled substance." *Norman v. State,* 968 A.2d 27, 28 (Del.2009). In *Norman,* we distinguished between a police officer trained in "apprehending criminals who are involved in drugs" from "a drug dealer who was familiar with cocaine because he bought and sold the drug." *Id.* at 31. That rationale is consistent with the Advisory Committee Notes to Federal Rule of Evidence 701, which explain that if the witness such a police officer was to testify about "how a narcotic was manufactured" or "the intricate workings of a narcotic distribution network," the witness would have to be qualified as an expert under Rule 702. Fed. R.Evid. 701 Advisory Committee Notes (2000) (citing *U.S. v. Figueroa–Lopez,* 125 F.3d 1241, 1246 (9th Cir.1997)).

**83.** *Lampkins v. State,* 1991 WL 22357, at *3 (Del.); *Gaston v. State,* 234 A.2d 324, 325 (Del.1967).

**84.** *Taylor v. State,* 298 A.2d 332, 337 (Del. 1972).

**85.** *Herhal v. State,* 283 A.2d 482, 485 (Del. 1971).

in-chief. Campbell claims that this alleged rebuttal testimony was merely to bolster the State's case. Campbell argues that the fact that Campbell introduced a defense exhibit during the State's case bars the State from rebutting that exhibit's significance. Campbell overlooks that he introduced the impeaching evidence when, on cross examination, Morales testified that the middle of the area indicated on the GPS printout between 980 and 1099 Port Penn Road appeared more than a mile from Campbell's house at 1 Liberty Street. Campbell ignores that he cross examined Morales, who acknowledged on cross that he could not think of a reason to stop on that Port Penn block. Campbell opened the door for rebuttal with this impeaching testimony about Morales' whereabouts on October 26. Then, Campbell testified that Morales did not come to his house that day.

To rebut Campbell's exhibit, the State called Detective Chorlton. Detective Chorlton rebutted Defense Exhibit 2, the Google map, with State Exhibit 5, showing MapQuest's result typing in the GPS coordinates. The trial judge properly allowed the rebuttal testimony and did not abuse his discretion.

### CONCLUSION

For the above reasons, the judgments of the Superior Court are **AFFIRMED**.