IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | |
|---|---|
| RONALD JACKSON, | § |
| | § No. 100, 2017 |
| Defendant Below, | § |
| Appellant, | § |
| | § Court Below—Superior Court |
| v. | § of the State of Delaware |
| | § |
| STATE OF DELAWARE, | § Cr. ID Nos. 1602015453A&B (N) |
| | § |
| Plaintiff Below, | § |
| Appellee. | § |

Submitted: December 22, 2017
Decided: February 16, 2018

Before **VAUGHN**, **SEITZ**, and **TRAYNOR**, Justices.

## **ORDER**

This 16th day of February 2018, upon consideration of the parties' briefs and the record below, it appears to the Court that:

(1)     The appellant, Ronald B. Jackson, filed this appeal from his convictions after a jury trial and a bench trial.[1]  We find no merit to the appeal and affirm the Superior Court's judgment.

(2)     On November 17, 2016, a Superior Court jury found Jackson guilty of Carrying a Concealed Deadly Weapon, Aggravated Menacing,

---

[1] Jackson was represented by counsel at trial, but was granted permission, after an evidentiary hearing in the Superior Court, to proceed *pro se* in this appeal.  Supr. Ct. R. 26(d)(iii).

Reckless Endangering in the First Degree, two counts of Possession of a Firearm During the Commission of a Felony ("PFDCF"), Criminal Mischief, Resisting Arrest, and Criminal Impersonation. In a bench trial, the Superior Court found Jackson guilty of Possession of a Firearm by a Person Prohibited ("PFBPP") and Possession of Ammunition by a Person Prohibited ("PABPP"). These charges had been severed from the other charges that were the subject of the jury trial. After granting the State's motion to declare Jackson a habitual offender under 11 *Del. C.* § 4214(c), the Superior Court sentenced Jackson to sixty years of Level V incarceration, suspended after thirty-five years.

(3) The following evidence was presented at Jackson's jury trial. On February 23, 2016 around 3 a.m., Officer James Wiggins and Officer Leonard Moses were on patrol in Wilmington. While conducting a traffic stop around Second Street and Madison Street, they heard a gunshot nearby. They drove toward West 4th Street and saw a black man in black clothing running down an alley. Officer Moses got out of the car and chased the man as Officer Wiggins drove around to try and cut the person off. Officer Wiggins left the car to explore the alley, but did not find anyone there.

(4) Returning to 2nd Street, Officer Wiggins heard Officer Moses call that he saw the suspect. Officer Moses had not seen anyone in the alley and

2

returned to 2nd Street where he saw the suspect standing on top of an exterior stairway to 201 North Madison Street. After Officer Moses called out to the suspect, he saw him throw a dark object over the railing. Officer Moses testified that when the object hit the ground it sounded like a gun hitting the pavement.

(5) Officer Wiggins and Officer Moses identified Jackson as the person on the stairs. As Jackson came down the stairs, he told the officers that the person they were looking for went east on 2nd Street. They did not see anyone in that direction. Jackson resisted when the police officers tried to take him into custody. The police officers eventually subdued Jackson on the ground and placed him in the back of their patrol car. There was a black and silver gun on the ground near where Jackson was seized. Jackson gave false names and birth dates when asked to identify himself.

(6) Another police officer, who was not wearing gloves, secured the gun. There were eight rounds of ammunition in the magazine and one round in the chamber. No fingerprints were found on the gun. The gun was not tested for DNA evidence. No gunshot residue tests were performed.

(7) After Jackson was secured, the police officers learned there was a 911 call reporting a shooting in the apartment building at 201 North Madison Street. Officer Wiggins went to the apartment of the caller, Tyrone Roberts.

Officer Wiggins saw a bullet hole in a living room window of the apartment. No discharged bullets or spent shell casings were found. A systems administrator with the Wilmington Police Department testified that ShotSpotter, an acoustic detection system company, reported a gunshot on February 23, 2016 at 201 North Madison Street.

(8) The police took Jackson to Wilmington Hospital where he was treated for a cut he suffered during his arrest. Jackson tried to flee at the hospital. He also continued to give the police false names and birth dates.

(9) Roberts testified that Jackson came to his apartment on February 23, 2016 after they had spent time together earlier in the day. Even though Jackson had punched him and sent him threatening text messages that day, Roberts let Jackson into the apartment. According to Roberts, Jackson threatened to kill him, pulled out a gun, and pointed the gun at his face. Jackson fired the gun, creating a hole in the window. Jackson told Roberts that could have been his life.

(10) Roberts then went to the bathroom where he called 911 on his cell phone. Roberts testified that he did not recall if he smoked PCP that night and that he had previously been found incompetent.[2] The Superior Court

---

[2] Before Roberts testified, he was questioned outside the presence of the jury regarding his understanding of the importance of an oath and the difference between a truth and a lie.

4

denied defense counsel's motion for judgment of acquittal on the charge of Aggravated Menacing, but *sua sponte* dismissed the Offensive Touching charge, which was based on Jackson punching Roberts, because it was unclear if that occurred in Delaware or Pennsylvania.

(11) Jackson testified in his own defense. Jackson testified that, on February 22, 2016, he drove Roberts to Philadelphia in exchange for gas money. After an argument, Jackson left Roberts in Philadelphia. Roberts called Jackson multiple times to demand the return of his money.

(12) According to Jackson, he went to Roberts' apartment that night to return Roberts' money. He noticed the odor of PCP when he returned the money to Roberts. He also claimed there was a hole in Roberts' window. While in Roberts' apartment, Jackson heard a gunshot outside of the apartment. Jackson testified that Roberts acted strangely after hearing the gunshot, possibly due to a PCP reaction, and accused Jackson of trying to kill him. Jackson left Roberts' apartment.

(13) When Jackson left the apartment building, he noticed a man running down the street. The police then stopped Jackson and asked him to come down the stairs. Jackson told the police about the running man, but the police arrested Jackson. According to Jackson, he gave false names to the police because he was confused and frightened after the police threw him onto

5

the ground. He testified that he tried to flee the hospital because he was nervous about how the police had treated him. During his testimony, Jackson stated that he was convicted of Maintaining a Dwelling for Keeping Controlled Substances and Conspiracy in the Second Degree in 2009. At defense counsel's request, the Superior Court instructed the jury to assume that if Jackson's coat on the night of his arrest had been collected or preserved by the State, it would not have incriminated Jackson and would have tended to prove Jackson not guilty.

(14) After the jury found Jackson guilty of Carrying a Concealed Deadly Weapon, Aggravated Menacing, Reckless Endangering in the First Degree, two counts of PFDCF, Criminal Mischief, Resisting Arrest, and Criminal Impersonation, the Superior Court held a bench trial on the PFBPP and PABPP charges. The State introduced the evidence from the jury trial. Jackson stipulated that he was a person prohibited from possessing a firearm or ammunition. The Superior Court found Jackson guilty of PFBPP and PABPP.

(15) On appeal, Jackson's claims may be summarized as follows: (i) the Superior Court erred in allowing a police officer to testify that the hole in Roberts' living room window was a bullet hole and to give possible reasons for why he did not find a projectile; (ii) his confrontation rights under the Sixth

6

Amendment of the United States Constitution were violated by the State's failure to call the preparer of the ShotSpotter report as a witness; (iii) the Superior Court erred in allowing the jury to receive a photograph of Jackson's injured lip; (iv) the Superior Court erred in allowing the State to present evidence of uncharged bad acts; and (v) there were multiple instances of prosecutorial misconduct that the Superior Court failed to address.

(16) Because Jackson did not object to the police officer's testimony concerning the cause of the hole in the living room window or possible reasons for why he could not locate a bullet projectile, we review this claim for plain error.[3] "Under the plain error standard of review, the error complained of must be so clearly prejudicial to substantial rights as to jeopardize the fairness and integrity of the trial process."[4] The burden of persuasion is on the defendant to show prejudice.[5] When a party elects not to object at trial as a tactical matter, there is a waiver that precludes plain error review on direct appeal.[6]

(17) Jackson contends there was no scientific basic for the police officer's expert testimony that: (i) there was a bullet hole in Roberts' living

---

[3] Supr. Ct. R. 8; *Wainwright v. State*, 504 A.2d 1096, 1100 (Del. 1986).

[4] *Wainwright*, 504 A.2d at 1100.

[5] *Brown v. State*, 897 A.2d 748, 752 (Del. 2006).

[6] *Wright v. State*, 980 A.2d 1020, 1023 (Del. 2009).

room window; and (ii) he was unable to find a projectile because the path of a fired bullet can be unpredictable and he had been to multiple shooting scenes where no projectiles were recovered. The police officer, who was a member of the forensics services unit, searched Roberts' apartment and the area around the building for a projectile. There is no plain error.

(18) The police officer testified as a lay person, not an expert. Under Delaware Rule of Evidence 701, a lay witness may testify in the form of an opinion or inference if that opinion or inference is "rationally based on the perception of the witness," "helpful to a clear understanding of the witness' testimony or the determination of a fact in issue," "and not based on scientific, technical, or other specialized knowledge." The police officer's testimony concerning the bullet hole and his failure to find the projectile was based on his rational perception of something he personally observed as well as his presence at other shooting scenes.[7] Even assuming the police officer offered expert testimony that was subject to the requirements of Delaware Rule of Evidence 702, Jackson cannot show prejudice given the other evidence

---

[7] *See, e.g.*, *Campbell v. State*, 974 A.2d 156, 168-69 (Del. 2009) (holding drug user's testimony that substance was methamphetamine based on his experience as a methamphetamine user was admissible as lay opinion under D.R.E. 701); *Ayers v. State*, 802 A.2d 278, 283-84 (Del. 2002) (finding police officers' testimony that they recognized certain activity as drug transactions based on their observations and experience did not constitute expert testimony).

offered at trial, including Roberts' testimony that Jackson fired a gun at him and left a bullet hole in his living room window.

(19) Jackson next contends that his Sixth Amendment right to confrontation was violated by the State's failure to call the preparer of the ShotSpotter report as a witness. Instead of calling a witness from ShotSpotter, the State called a Wilmington Police Department systems administrator, who testified that ShotSpotter reported a gunshot on February 23, 2016 at 201 North Madison Street. Jackson did not raise this objection at trial, so we review for plain error.[8] Jackson has not shown plain error.

(20) It appears that defense counsel's decision not to object was tactical. On cross-examination, defense counsel elicited testimony that the ShotSpotter report did not show whether the shot was inside or outside the building at 201 North Madison Street. No one, including Jackson, disputed that there had been a shot in the area. When a party elects not to object at trial as a tactical matter, there is a waiver that precludes plain error review on direct appeal.[9] In any event, Jackson cannot show any prejudice. Multiple witnesses, including Jackson, testified that they heard a gunshot near 201 North Madison Street.

---

[8] *See supra* n.3.
[9] *Wright*, 980 A.2d at 1024.

9

(21) Jackson next contends that the Superior Court erred in allowing the jury to consider a photograph of Roberts' injured lip without a limiting instruction. Jackson was charged with Offensive Touching based on his punching Roberts in the face. During Roberts' testimony, a photograph of his injured lip was admitted into evidence. After the State finished its case, the Superior Court *sua sponte* dismissed the Offensive Touching charge because it was unclear if that conduct occurred in Delaware or Pennsylvania. Defense counsel requested a limiting instruction as to the photograph.

(22) After the defense finished its case, the Superior Court told the jury that: (i) the Offensive Touching charge had been dismissed; (ii) the testimony relating to Jackson punching Roberts was being offered for other reasons; (iii) the jury would not have the photograph of Roberts' injured lip for their deliberations; and (iv) the jury was not to consider the photograph during deliberations. During a subsequent prayer conference, the Superior Court suggested to counsel that the photograph remain because it was admitted without objection, it was relevant, and it was not prejudicial because Jackson testified that he had punched Roberts in the face. The Superior Court asked if counsel objected and they stated that they did not. Defense counsel indicated that she just wanted to make sure the jury would not consider the photograph as to the dismissed charge of Offensive Touching. The Superior

10

Court judge indicated he would give that instruction again, but did not do so. Defense counsel did not object.

(23) Because Jackson's counsel did not object to the Superior Court's decision to leave in the photograph, this claim is subject to plain error review.[10] Jackson actually benefitted from the Superior Court's failure to give another limiting instruction regarding the photograph because the Superior Court's last instruction to the jury was to disregard the photograph. This was the case even if the jury had the photograph during deliberations. The Court presumes that the jury followed the Superior Court's instruction.[11] In any event, Jackson cannot show any prejudice from the photograph in light of his testimony that he punched Roberts in the face.

(24) Jackson next argues that the Superior Court erred in allowing the State to present evidence of uncharged bad acts (video footage from Officer Wiggins' body camera reflecting the events, including the gunshot, that led to Jackson's arrest) that he proved at trial were committed by someone else. Jackson contends that the Superior Court should have considered the five factors set forth in *Getz v. State*[12] before admitting the evidence under D.R.E.

---

[10] *See supra* n.3.
[11] *Capano v. State*, 781 A.2d 556, 589 (Del. 2001).
[12] 538 A.2d 726 (Del.1988).

404(b), and given a limiting instruction under D.R.E. 105. This claim was not raised in the Superior Court so we review for plain error.[13]

(25) There is no plain error here. Under Rule 404(b) evidence of other crimes or wrongs "is not admissible to prove the character of a person in order to show action in conformity therewith," but may be admissible for other purposes such as proof of motive or intent. "[T]o trigger Rule 404(b), the State must attempt to introduce evidence of *another crime, wrong or act committed by the defendant for which the defendant was not then on trial*."[14] Rule 404(b) is not applicable here because the video footage was evidence of the crimes Jackson was on trial for (i.e., Jackson recklessly endangering Robert's life by firing a gun at him), not other crimes or wrongs for which Jackson was not on trial.[15] As to Jackson's arguments about inconsistent testimony from Roberts, Officer Moses, and himself regarding his appearance on the night in question, those arguments go to the weight of the evidence, not the admissibility.

(26) Finally, Jackson argues that the prosecutor engaged in misconduct by: (i) impermissibly vouching for Roberts' truthfulness; (ii)

---

[13] *See supra* n.3.

[14] *Pennell v. State*, 602 A.2d 48, 53 (Del. 1991) (emphasis added).

[15] *See, e.g., Smiley v. State*, 1992 WL 53401, at *2 (Del. Jan. 31, 1992) (holding police officer's testimony concerning his observations of the defendant's drug dealing activity was the basis for the charge of intent to deliver cocaine).

improperly suggesting that the police could not locate a shell casing in Roberts' apartment because Jackson removed the casing; (iii) incorrectly asserting that the police officers testified Jackson refused to raise his hands; (iv) misstating evidence in the ShotSpotter report; (v) improperly reenacting the gun falling to the ground; and (vi) knowingly offering perjured testimony.

(27) Because Jackson did not object to any of this alleged prosecutorial misconduct at trial, we review for plain error.[16] The first step in plain error review for prosecutorial misconduct is similar to a review for harmless error.[17] First, this Court reviews the record *de novo* to determine whether prosecutorial misconduct occurred.[18] If there is no finding of misconduct, then the analysis ends.[19] If, however, we find that prosecutorial misconduct did occur, then we apply the plain error standard set forth in *Wainwright*.[20] If we determine that the error does not warrant reversal under *Wainwright*, we must still determine if the prosecutor's improper statements were so repetitive that the errors cast doubt on the integrity of the judicial process.[21]

---

[16] *See supra* n.3.
[17] *Baker v. State*, 906 A.2d 139, 150 (Del. 2006).
[18] *Id.*
[19] *Id.*
[20] *Id.*
[21] *Id.*

(28) Jackson claims that the prosecutor improperly vouched for Roberts' credibility during closing argument when he asked whether it was more natural to have immediate recall of minor details from nine months earlier (as reflected by Jackson's testimony) or to forget some details, but to remember significant events like someone shooting at you (as reflected by Roberts' testimony). "Improper vouching occurs when the prosecutor implies some personal superior knowledge, beyond that logically inferred from the evidence at trial, that the witness testified truthfully."[22] The prosecutor's comments were based on the testimony of Roberts and Jackson at trial. He did not imply a superior personal knowledge, but rather asked the jury to draw on their collective life experience to evaluate the credibility of Roberts' and Jackson's testimony.

(29) As to the prosecutor's statements in his closing argument regarding the police's failure to find a shell casing in Roberts' apartment, both sides may argue all inferences that may be logically inferred from the evidence presented at trial.[23] Based on the testimony of Roberts and Jackson, it was logically inferable that Jackson could have picked up the shell casing while Roberts was in the bathroom. This claim is without merit.

---

[22] *White v. State*, 816 A.2d 776, 779 (Del. 2003).

[23] *Kirkley v. State*, 41 A.3d 372, 377 (Del. 2012) (internal citations omitted).

14

(30) Jackson also contends that, contrary to the testimony of Officer Wiggins, the prosecutor wrongly told the jury that "as the defendant is being taken into custody, you heard the testimony of the officers that he struggled, and that he wouldn't give up his hand."[24] Officer Wiggins testified that Jackson initially put his hands behind his back as directed, but also that Jackson resisted and tried to get loose with his shoulders and arms when the police officers tried to handcuff him.[25] The prosecutor's statement is not inconsistent with the evidence presented at trial.

(31) As to the ShotSpotter evidence, Jackson claims that the prosecutor misstated the evidence when he told the jury "the defendant's testimony was that the shot came from outside, came from somewhere else. ShotSpotter evidence may suggest otherwise."[26] The evidence presented at trial was that ShotSpotter located the gunshot at 201 North Madison Street, but did not show whether the gunshot was inside or outside the building. The prosecutor's statement that the ShotSpotter evidence suggested the gunshot did not come from somewhere other than 201 North Madison Street as Jackson testified did not misstate the evidence. To the extent Jackson claims the prosecutor misstated the evidence to suggest that ShotSpotter showed the

---

[24] Appendix to the Appellant's Opening Brief at A110-11.
[25] Appendix to State's Answering Brief at B9, B13.
[26] A112-13.

15

gunshot occurred inside 201 North Madison Street, any misstatement was corrected on rebuttal, when defense counsel emphasized that ShotSpotter showed the area of the gunshot, not the exact room, apartment, or building. As to Jackson's argument that a page of the ShotSpotter report not admitted into evidence at trial clearly shows the gunshot occurred outside of 201 North Madison Street, the document does not support this argument.

(32) As to the prosecutor dropping the gun during his closing argument to demonstrate the sound it would make, the State concedes this was improper. We agree with the State, however, that this demonstration did not constitute plain error. This was not a close case. There was ample evidence to support Jackson's convictions for possessing and firing the gun, including: (i) Roberts' testimony that Jackson fired a gun at him; (ii) Roberts' 911 call; (iii) the testimony of multiple witnesses who heard a gunshot near 201 North Madison Street; (iv) Officer Wiggins' body camera footage capturing the sound of a nearby gunshot; (v) Officer Moses' testimony that he saw Jackson throw away a gun; and (vi) the presence of a gun near where Jackson was arrested. The Superior Court also instructed the jury that the witnesses' testimony and exhibits introduced through that testimony were the only evidence they could consider in reaching their verdict. Having carefully

reviewed the record, we conclude that the prosecutor's demonstration was not so repetitive as to cast doubt on the integrity of the judicial process.

(33) Finally, Jackson claims that the prosecutor knowingly offered perjured testimony from Officer Moses. This claim is based on the alleged difference between Officer Moses' statements in his affidavit and at the preliminary hearing that he saw Jackson on the second level of the exterior stairs to 201 North Madison Street versus his testimony at trial (along with Officer Wiggins) that he saw Jackson on the top level (the third level) of the exterior stairs to 201 North Madison Street. Jackson contends that the prosecutor caused Officer Moses and Officer Wiggins to change their testimony after learning Jackson intended to impeach them with body camera footage showing Jackson, without a gun, on the second level of the exterior stairs.

(34) Jackson fails to acknowledge that Officer Moses also testified at trial that he saw Jackson on the second level of the exterior stairs. In addition, the body camera footage in the record does not support Jackson's speculation. Having carefully considered the parties' briefs and the record on appeal, we conclude that Jackson's arguments are without merit.

NOW, THEREFORE, IT IS ORDERED that the judgment of the Superior Court is AFFIRMED.

BY THE COURT:

*/s/ Collins J. Seitz, Jr.*
Justice